No. 8610UC427: STATE OF NORTH CAROLINA EX REL. UTILITIES COMMIS-
SION, MCI TELECOMMUNICATIONS CORPORATION AND U.S. SPRINT
COMMUNICATIONS COMPANY v. SOUTHERN BELL TELEPHONE AND
TELEGRAPH COMPANY; THE PUBLIC STAFF; AT&T COMMUNICA-
TIONS, INC.; CENTRAL TELEPHONE COMPANY; ALLTEL CAROLINA,
INC.; GENERAL TELEPHONE COMPANY OF THE SOUTHEAST; CARO-
LINA TELEPHONE COMPANY; TELECOMMUNICATIONS SYSTEMS,
INC.; CAROLINA UTILITY CUSTOMERS ASSOCIATION; ATTORNEY
GENERAL OF THE STATE OF NORTH CAROLINA; AND NORTH
CAROLINA LONG DISTANCE ASSOCIATION

No. 8610UC610: STATE OF NORTH CAROLINA EX REL. UTILITIES COMMIS-
SION, MCI TELECOMMUNICATIONS CORPORATION AND U.S. SPRINT
COMMUNICATIONS COMPANY v. SOUTHERN BELL TELEPHONE AND
TELEGRAPH COMPANY, THE PUBLIC STAFF; CENTRAL TELEPHONE
COMPANY; ALLTEL CAROLINA, INC.; GENERAL TELEPHONE COM-
PANY OF THE SOUTHEAST; CAROLINA TELEPHONE COMPANY;
TELECOMMUNICATIONS SYSTEMS, INC.; CAROLINA UTILITY CUS-
TOMERS ASSOCIATION; ATTORNEY GENERAL OF THE STATE OF
NORTH CAROLINA; AND NORTH CAROLINA LONG DISTANCE
ASSOCIATION

Nos. 8610UC427 and 8610UC610

(Filed 22 December 1987)

1. **Telecommunications § 1.2; Constitutional Law § 23.1 — telecommunications reg-
ulation — operating expenses increased, return on investment decreased — not
unconstitutional taking of property**

   Where the Utilities Commission entered an order requiring certain long
distance carriers to pay compensation for the unauthorized transmission of
some long distance calls, the order was not unlawfully confiscatory and thus a
violation of the prohibition against the taking of property without due process
because there was nothing which compelled U.S. Sprint to operate in North
Carolina at a loss, there was no evidence that U.S. Sprint was being required
to operate at an unfair return on its investment, and U.S. Sprint was free to
dismantle its operation in the state. N.C.G.S. § 62-94(b)(1).

2. **Utilities Commission § 20; Telecommunications § 1.1 — payment by long
distance carriers for unauthorized transmission of long distance calls — not an
unauthorized penalty**

   An order of the Utilities Commission did not constitute a penalty and was
statutorily authorized where, pursuant to the federally ordered breakup of
AT&T, the Utilities Commission directed that certain long distance carriers
pay compensation for the unauthorized transmission of some long distance
calls. The plan was reasonably calculated to provide protection for the local ex-
changes who provided needed services to local exchange customers and the
compensation plan was a proper term or condition of certification consistent
with the public interest. N.C.G.S. § 62-110, N.C.G.S. § 62-94(b)(2), N.C.G.S.
§ 62-312.

State ex rel. Utilities Comm. v. Southern Bell

3. **Telecommunications § 1.1; Constitutional Law § 20.1— requirement that certain long distance carriers pay compensation for unauthorized transmission of some long distance calls—no violation of equal protection**

A Utilities Commission order did not violate the equal protection clauses of the United States and North Carolina Constitutions where, pursuant to the federally ordered breakup of AT&T, the Utilities Commission directed that certain long distance carriers pay compensation for the unauthorized transmission of some long distance calls. The plan was rationally related to the objective of insuring that the legitimate State objective of providing its citizens with a competitive telecommunications environment beneficial to the individual consumer was accomplished in an equitable manner without jeopardizing reasonably affordable local exchange service. N.C.G.S. § 62-110.

4. **Telecommunications § 1.1; Constitutional Law § 27.1— State regulation of long distance carriers—not undue burden on interstate commerce**

An order of the North Carolina Utilities Commission requiring some long distance carriers to pay compensation for the unauthorized transmission of some long distance calls was not unduly burdensome on interstate commerce where the plan adopted was temporary and reasonable, and similar plans worked effectively in other states and have been upheld in similar suits.

5. **Telecommunications § 1.1; Utilities Commission § 5— intrastate long distance telecommunications—regulation by State—valid**

A North Carolina Utilities Commission order requiring certain long distance carriers in North Carolina to pay compensation for the unauthorized transmission of long distance calls was a valid regulatory exercise of authority over intrastate telecommunications, which were left to the control of State legislators and their regulatory agencies.

6. **Telecommunications § 1.1— payment for unauthorized transmission of long distance calls—not money damages**

A Utilities Commission order that long distance carriers pay compensation for the unauthorized transmission of some long distance calls was a proper term or condition of certification consistent with the public interest and not an improper award of money damages.

7. **Telecommunications § 1.1; Constitutional Law § 23.4— long distance carriers required to compensate local exchanges—no violation of due process**

An order of the North Carolina Utilities Commission that certain long distance companies, including MCI, pay compensation to local exchanges for the unauthorized transmission of long distance calls did not violate MCI's right to due process of law in that MCI was not informed prior to the first hearing of what the ultimate decision would be where exhaustive hearings were conducted at each step, MCI was present and represented by counsel at each stage of the proceedings, the record is replete with evidence that a compensation plan was considered from the outset of the hearings, an order on 22 February found that OCCs such as MCI and resellers should be required to pay compensation to LECs, and the Commission then held further hearings before setting the final rate of compensation.

State ex rel. Utilities Comm. v. Southern Bell

**8. Telecommunications § 1.1; Utilities Commission § 20— compensation for unauthorized transmission of long distance telephone calls—proceedings not arbitrary or capricious**

An order of the Utilities Commission requiring compensation for the unauthorized transmission of long distance telephone calls was not arbitrary and capricious where the case involved numerous hearings at which voluminous amounts of evidence were taken; the Commission heard from dozens of witnesses; there was plenary evidence to support the Commission's findings, conclusions, and orders, although not all of the witnesses advocated the decision made by the Commission; and, although the Commission's decision may not be the best solution or the most desirable to all parties, that does not render the proceedings arbitrary and capricious.

**9. Utilities Commission § 43; Telecommunications § 1.1— compensation between telecommunications carriers—not rate discrimination**

An order of the North Carolina Utilities Commission requiring that certain long distance carriers pay compensation to local area exchanges for the unauthorized transmission of some long distance calls did not constitute unjust and unreasonable rate discrimination. N.C.G.S. § 62-140(a) was enacted to prohibit a utility from unreasonable discrimination among its customers, and was not meant to be applied to the North Carolina Utilities Commission's conduct towards various public utilities.

**10. Telecommunications § 1.1— intraLATA access charges authorized under statute—supported by evidence**

In a Utilities Commission proceeding to introduce competition to the North Carolina intrastate long distance telecommunications market following the breakup of AT&T, an intraLATA access charge was within the authority of N.C.G.S. § 62-110 in that the Commission intended the tariff to provide funds to set off those expenditures that the local exchange companies were required to make to provide additional facilities to handle additional intraexchange company carrier access, and the order requiring the tariff was supported by evidence in that the record was replete with testimony supporting a factual finding that access charge tariffs were designed to reflect accurately the actual usage of the local exchange company facilities by resellers and other common carriers.

**11. Telecommunications § 1.1— regulation of intrastate telecommunication competition—order requiring access charge tariffs—not unconstitutional**

An order of the North Carolina Utilities Commission requiring access charge tariffs was distinguishable from *In re Arcadia Dairy Farms*, 43 N.C. App. 459, and was constitutional where the plan here was designed to compensate local exchange companies for revenues lost due to the transmission of unauthorized traffic over the facilities of other common carriers and those lines rented by resellers; the plan was not designed to protect North Carolina companies from competition; and the plan was a temporary device calculated to compensate local exchange companies for loss of revenue to unauthorized intrastate intraLATA telecommunications carriers during the relatively brief period of transition to a competitive marketplace.

IN Case No. 8610UC427, appeal by MCI Telecommunications Corporation and U.S. Sprint Communications Company from Order of North Carolina Utilities Commission entered 30 September 1985. Heard in the Court of Appeals on 8 December 1986.

In Case No. 8610UC610, appeal by MCI Telecommunications Corporation and cross appeal by the North Carolina Long Distance Association from Order of North Carolina Utilities Commission entered 19 December 1985. Heard in the Court of Appeals on 8 December 1986.

*Public Staff Executive Director Robert P. Gruber by Chief Counsel Antoinette R. Wike for appellee, North Carolina Utilities Commission.*

*Sanford, Adams, McCullough & Beard by Charles C. Meeker and Gary S. Maines; Of Counsel Michael M. Ozburn for plaintiff appellant, MCI Telecommunications Corporation.*

*Rita A. Barmann; Reboul, MacMurray, Hewitt, Maynard & Kristol by Deborah A. Dupont; and Poyner & Spruill by J. Phil Carlton and Nancy Bentson Essex for plaintiff appellant, U.S. Sprint Communications Company.*

*Hunton & Williams by Edward S. Finley, Jr., and Grady L. Shields; and General Attorney J. Billie Ray, Jr., for appellee, Southern Bell Telephone and Telegraph Company.*

*Tharrington, Smith & Hargrove by Wade H. Hargrove; and Gene V. Coker for appellee, AT&T Communications of the Southern States, Inc.*

*Senior Attorney Jack H. Derrick and Vice President-General Counsel & Secretary Dwight W. Allen for appellee, Carolina Telephone and Telegraph Company.*

*General Counsel for North Carolina Long Distance Association, John Jordan; and Walter E. Daniels and Linda Markus Daniels for North Carolina Long Distance Association.*

COZORT, Judge.

These appeals arise from orders of the North Carolina Utilities Commission introducing competition into the North Carolina intrastate long distance telecommunications market following the

federal court ordered breakup of the American Telephone and Telegraph Company. The specific orders appealed from (1) directed certain long distance carriers to pay compensation for the unauthorized transmission of some long distance calls; and (2) directed local companies to file tariffs setting the access charges resellers of long distance services must pay on certain types of calls. We affirm the orders of the Commission.

The two orders appealed from came to this Court as separate cases. We granted a motion to have the cases scheduled for argument on the same day. Because some of the same parties appear in both cases and many of the pertinent issues are related, we have consolidated the cases for the purposes of this opinion.

The orders appealed from were issued by the North Carolina Utilities Commission pursuant to a federal court ordered breakup of the American Telephone and Telegraph Company, hereinafter "AT&T." Because of the complexity of the issues presented, we shall begin with a review of the history of the telecommunications market, the federal court actions, and the business relationships of the parties to this appeal.

I.

HISTORY AND EVOLUTION OF THE NATION'S
TELECOMMUNICATIONS MARKET.

During the past century our nation's telecommunications system has increasingly become a more important part of our business, social, and personal existence. AT&T grew with the national system to the point of essentially engulfing it. As AT&T strengthened its hold on national telecommunications, its competition and the federal government sought ways to loosen AT&T's grip.

The first benchmark in legal actions aimed at AT&T was filed by the United States Government on 14 January 1949. *See U.S. v. AT&T*, 552 F. Supp. 131, 135-39 (D.D.C. 1982), *aff'd sub nom. Maryland v. U.S.*, 460 U.S. 1001 (1983). This antitrust litigation which sought an end to AT&T's virtual monopoly did not produce that result. 552 F. Supp. at 138-39. Consequently, a separate

antitrust action was filed by the Justice Department in 1974. *Id.* at 139.[1]

Prior to the 1974 antitrust filing, the Federal Communications Commission (F.C.C.) had attempted to provide freer access to the telecommunications market which would have theoretically assisted in opening those mediums to competition. *See Above 890,* 39 F.C.C. 650 (1959). Because of the strength of the Bell System and the failure of previous litigation, little progress in implementing competition was achieved. A review of the service available at that time will help explain the lack of progress.

A.  *Pre-divestiture Telecommunications Market*

Local telephone service was provided in North Carolina and in other states by Local Exchange Companies (LECs). These LECs were either one of two types: local independent companies, or Bell Operating Companies (BOCs), which were, in effect, local subsidiaries of AT&T. Appellee Carolina Telephone Company is an example of the former, while appellee Southern Bell is an example of the latter. In North Carolina these companies operated without competition in specific geographically defined territories pursuant to state authorization. They were, simply put, legal monopolies in their respective regions. They provided origination and termination facilities and services in their areas. When a customer in one of these areas made a telephone call to another person who was also a customer in the same area, an "exchange" call, the LEC would be responsible for the connection from start (origination) to finish (termination) and everything in between.[2] *See AT&T,* 552 F. Supp. at 141 n.37 and accompanying text. In other words, from the time the caller dialed a number on his telephone until the intended recipient of the call lifted the receiver, the transmission never left the LEC's network.

---

1. For a detailed history of AT&T litigation, *see U.S. v. AT&T,* 552 F. Supp. 131, 135-40 (D.D.C. 1982).

2. This type of telephone service is referred to in *AT&T* as being an "exchange" service, which generally is a service provided local customers by LECs. *See id.* at 141. This would include essentially all calls that originate and terminate within the same state authorized geographic monopoly. This type call will, later in this opinion, be illustrated to be practically identical to an *intra*LATA call in the post-divestiture market.

When the local customer sought a connection with a person outside of the geographic area serviced by the LEC, the traffic was described as "interexchange."[3] An "interexchange" call would leave the local area of origination and be picked up by the "interexchange carrier" (IXC) who would route the call to the LEC that serviced the area where the call was to terminate. This IXC service was almost without fail provided by AT&T. The terminating LEC would then handle the traffic until the intended connection was completed when the terminating LEC's local customer lifted the receiver.

The problem with attempting to introduce competition to the "interexchange" market during these pre-divestiture years was that many, if not most, of the nation's LECs were owned and operated by the Bell System. *See AT&T*, 552 F. Supp. at 139 n.19. *See also, GTE Sprint v. AT&T*, 230 Va. 295, 298, 337 S.E. 2d 702, 704 (1985). ("GTE Sprint" is now known as "U.S. Sprint.") Potential IXC competitors of AT&T *could* therefore be effectively hindered or denied in their attempts to gain access to *all* local customers. If, for example, a caller's intended termination point on an interexchange call happened to be within a geographic monopoly serviced by a Bell-operated LEC, an IXC competitor of AT&T had to rely on the good graces of AT&T to be afforded complete and equal access. Without such complete and equal access, the public, as consumers, would be reluctant to do business with an AT&T IXC competitor because the IXC competitors of AT&T were competing with a system that could complete calls anywhere in the country. The AT&T system had unlimited access to *all* local exchanges in the nation. In addition, local independent LECs were hesitant to jeopardize any working relation with AT&T, the dominant "interexchange" carrier, by becoming too cozy with AT&T's IXC competitors, because they too wanted their customers to be able to terminate connections in foreign local service areas that were served by Bell-operated LECs.

---

3. For all intents and purposes, AT&T handled practically all the "interexchange" traffic prior to divestiture. "Interexchange" traffic is that which originated in one area serviced by a North Carolina authorized monopoly and had or has a termination point, either interstate or intrastate, outside that geographical service area. This type call will, later in this opinion, be illustrated to be practically identical to an *inter*LATA call in the post-divestiture market.

Thus, AT&T handled practically all "interexchange" telephone traffic. Local access had become the critical component for any national telecommunications company.

### B.  *The Divestiture of 1982*

Access to this crucial link in long distance dialing, the local connection, was the basis of the filing of the 1974 antitrust action. The government's contention in that filing was that AT&T so tightly controlled access to so much of the local exchange network through its BOCs that potential competitors of AT&T were shut out of those local markets. The complaint contended that AT&T in reality enjoyed a monopoly in the "interexchange" telecommunications market. It was not until 1982, eight years after the second antitrust suit was filed, that the relief sought by the government became a reality. *See AT&T*, 552 F. Supp. at 131.

In an interim decision in the case, District Judge Harold H. Greene denied an AT&T motion to dismiss the 1974 filing pursuant to Rule 41(b) of the Federal Rules of Civil Procedure. *U.S. v. AT&T*, 524 F. Supp. 1336 (D.D.C. 1981). After this published denial, the parties tendered a proposed settlement to the federal court. That settlement offer, based on an agreement between AT&T and the Justice Department, was ultimately approved and adopted by Judge Greene, in an Order of Judgment denominated a Modification of Final Judgment (MFJ).

As a result of the MFJ, AT&T retained two subsidiaries, Western Electric Company, Inc., and Bell Telephone Laboratories, Inc. *GTE Sprint*, 230 Va. at 298, 337 S.E. 2d at 704; *AT&T*, 552 F. Supp. at 139 n.19. The twenty-two BOCs were divested from AT&T and divided into Local Access and Transport Areas (LATAs).[4] A LATA "generally center[s] upon a city or other identifiable community of interest. Simply put, a LATA marks the

---

4. For purposes of this appeal, it is uncontested that there are five LATAs in North Carolina which are the respective regional geographical limits beyond which Southern Bell could not, at the time of the Commission's 30 September Order, offer telecommunications services. Further, the service areas of all independent telephone companies in North Carolina are either associated with a Southern Bell LATA or organized into geographical market areas that are equivalent thereto. *See* Common Docket No. P-100, Sub. 65. LATAs in North Carolina are conterminous with the geographical boundaries that previously delineated state authorized local exchange company monopolies.

boundaries beyond which (in the future) a Bell Operating Company may not carry telephone calls." *U.S. v. Western Electric Co.*, 569 F. Supp. 990, 993 nn.4 and 9 and accompanying text. (D.D.C. 1983.)

By forcing AT&T to divest the BOCs that had, prior to the MFJ, performed an LEC function for AT&T, it was hoped that the desired national policy of telecommunications competition could be accomplished in the interstate market.[5] Before the MFJ, these companies had blended into the AT&T scheme and existed therein without readily definable distinctions. In the post-divesti-ture days, these "former" BOCs were to act independently of AT&T, and to exist severed from AT&T in a manner consistent with the relationship that had existed between AT&T and local independent LECs. *AT&T*, 552 F. Supp. at 170-71.

## C. *Post-Divestiture Telecommunications Market*

The MFJ spelled out the function the BOCs were to perform in the services field after divestiture: "(1) to engage in *exchange telecommunications*, that is, to transport traffic between telephones located within a LATA, and (2) to provide *exchange access* within a LATA, that is, to link a subscriber's telephone to the nearest transmission facility of AT&T or one of AT&T's long-haul competitors [*e.g.*, MCI and U.S. Sprint]." *Western Electric Co.*, 569 F. Supp. at 994 (footnotes omitted) (emphasis added). The federal order forced the BOCs

> to relinquish to AT&T their right to carry long distance traf-fic between LATAs but [they] were granted the right, denied to AT&T, to transport communications which originate and terminate within a single LATA (intraLATA [or exchange] traffic). Only AT&T and its competitors, the other common carriers such as MCI and GTE Sprint, were permitted to pro-vide service between LATA's (interLATA [or interexchange] traffic).

*GTE Sprint*, 230 Va. at 298, 337 S.E. 2d at 704.

---

5. "The history of the American economic system teaches that fair competition is more likely to benefit all, especially consumers, than an industry dominated by a single-company monopolist. There is no reason to believe that the experience of the telecommunications industry will be contrary to that rule." *AT&T*, 552 F. Supp. at 170.

### 1.  Post-divestiture companies

Long haul, or IXC, competitioners of AT&T had emerged onto the national telecommunications scene pursuant to F.C.C. authority and have competed actively with AT&T in the interstate market for some time.[6] Interexchange carriers (IXCs) can generally be divided into three categories with distinctive characteristics: AT&T, other common carriers (OCCs), and "resellers," of long distance services.

Because of its historical dominance in the long distance market, AT&T is in an IXC category by itself. AT&T maintains its own facilities and remains the primary carrier of interstate telecommunications traffic.

Like AT&T, OCCs also establish and maintain their own facilities. Unlike AT&T, however, they have traditionally been totally dependent on both types of LECs, the Bell Operated Companies *and* local independents, for origination and termination of their traffic.[7] Appellants U.S. Sprint and MCI are both OCCs competing directly with AT&T.

The third type of long haul competitor is the reseller. Resellers do not maintain their own facilities; rather, they purchase "use time" from facility operating companies and offer it for resale to the consuming public. Their interests are represented in these appeals by the North Carolina Long Distance Association.

In summary, post-divestiture companies party to this appeal fall into two major categories: One group is composed of interexchange carriers (IXCs), including AT&T, OCCs and resellers. These companies provide interexchange connections between

---

6. These competitors began to enter the national telecommunications field pursuant to F.C.C. authorization, but due to the domination of the market by AT&T were unable to compete effectively until recently. Since divestiture, they control a growing portion of the market share of interexchange communications.

7. Although AT&T also relied to a certain extent on local independents for one end or the other of certain traffic, and both ends of some traffic, local independents, as discussed earlier, also were by necessity forced to depend on AT&T to complete calls made by their local customers to termination points outside the local independent's service area. OCCs were at a disadvantage to offer local independents the same transfer service as AT&T, because the termination point intended by the local independent customer could have been to an LEC that was an AT&T controlled BOC.

local exchange service areas. The second group is composed of the Local Exchange Companies (LECs) that provide local exchange service, some long distance service within their protected areas, and consumer access to IXCs. Divested BOCs now perform the same function as local independent companies do in their operation as LECs. *AT&T*, 552 F. Supp. at 131, 139 n.19, and 171; *Western Electric Co.*, 569 F. Supp. at 994-95.

## 2.  Post-divestiture service

Post-divestiture long distance service is also best understood by viewing it categorically. "[F]ollowing the court ordered reorganization, long distance service is now divided into three categories: interstate service regulated by the Federal Government; intrastate interLATA service, regulated by the states; and intrastate intraLATA service regulated by the states." *GTE Sprint*, 230 Va. at 298, 337 S.E. 2d at 704.

The MFJ entered by Judge Greene was affirmed by the United States Supreme Court on 23 February 1983. On 29 June 1984, the North Carolina General Assembly enacted legislation, effective that date, to amend the powers and duties of the North Carolina Utilities Commission. 1983 N.C. Sess. Laws Ch. 1043 (2d Sess. 1984). In § 1, the General Assembly amended N.C. Gen. Stat. § 62-2 by adding a new paragraph at the end to read:

> Because of technological changes in the equipment and facilities now available and needed to provide telephone and telecommunications services, changes in regulatory policies by the federal government, and changes resulting from the court-ordered divestiture of the American Telephone and Telegraph Company, competitive offerings of certain types of telephone and telecommunications services may be in the public interest. Consequently, authority shall be vested in the North Carolina Utilities Commission to allow competitive offerings of long distance services by public utilities defined in G.S. 62-3(23)a.6. and certified in accordance with the provisions of G.S. 62-110.

In § 2, N.C. Gen. Stat. § 62-110 was amended by adding two new paragraphs at the end to read:

> The Commission shall be authorized to issue a certificate to any person applying to the Commission to offer long dis-

tance services as a public utility as defined in G.S. 62-3(23) a.6., provided that such person is found to be fit, capable, and financially able to render such service, and that such additional service is required to serve the public interest effectively and adequately; provided further, that in such cases the Commission shall consider the impact on the local exchange customers and only permit such additional service if the Commission finds that it will not jeopardize reasonably affordable local exchange service. Notwithstanding any other provision of law, the terms, conditions, rates, and interconnections for long distance services offered on a competitive basis shall be regulated by the Commission in accordance with the public interest. In promulgating rules necessary to implement this provision, the Commission shall consider whether uniform or nonuniform application of such rules is consistent with the public interest. Provided further that the Commission shall consider whether the charges for the provision of interconnections should be uniform.

For purposes of this section, long distance services shall include the transmission of messages or other communications between two or more central offices wherein such central offices are not connected on July 1, 1983, by any extended area service, local measured service, or other local calling arrangement.

On 24 July 1984, the Utilities Commission initiated the proceeding which led to these appeals. On that date, the Commission issued an "ORDER INSTITUTING INVESTIGATION, SCHEDULING HEARINGS AND REQUIRING PUBLIC NOTICE." By that Order, the Commission began to investigate whether intrastate long distance competition in the North Carolina telecommunications market would benefit the North Carolina consumer. The Commission commenced a lengthy process of hearings resulting in, among other things, the orders appealed herein. Before proceeding to an analysis of the orders and the issues presented for appeal, we first state the standard governing appellate review of North Carolina Utilities Commission orders.

## II.

### STANDARD OF REVIEW

In North Carolina, the standard that governs appellate review of Utilities Commission orders is statutorily articulated:

(b) So far as necessary to the decision and where presented, the court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning and applicability of the terms of any Commission action. The court may affirm or reverse the decision of the Commission, declare the same null and void, or remand the case for further proceedings; or it may reverse or modify the decision if the substantial rights of the appellants have been prejudiced because the Commission's findings, inferences, conclusions or decisions are:

(1) In violation of constitutional provisions, or

(2) In excess of statutory authority or jurisdiction of the Commission, or

(3) Made upon unlawful proceedings, or

(4) Affected by other errors of law, or

(5) Unsupported by competent, material and substantial evidence in view of the entire record as submitted, or

(6) Arbitrary or capricious.

(c) In making the foregoing determinations, the court shall review the whole record or such portions thereof as may be cited by any party and due account shall be taken of the rule of prejudicial error. The appellant shall not be permitted to rely upon any grounds for relief on appeal which were not set forth specifically in his notice of appeal filed with the Commission.

N.C. Gen. Stat. § 62-94(b) and (c). In analyzing this limited right of review, our Supreme Court stated that any findings of fact made by the Commission, if "supported by competent, material and substantial evidence [is] conclusive," even if the reviewing court would have reached a different result on the same evidence. *Utilities Commission v. The Public Staff*, 317 N.C. 26, 34, 343 S.E. 2d 898, 903 (1986).

## III.

### CASE NO. 8610UC427

After initiating the investigation, the North Carolina Utilities Commission conducted six public hearings in six different North Carolina cities between 15 October and 22 October 1984. On 22 February 1985, the Commission entered an "ORDER AUTHORIZING INTRASTATE LONG-DISTANCE COMPETITION." In that Order, the Commission determined that intrastate telecommunications in North Carolina, to that date, was being provided by certified public utilities, each with a legal monopoly in its service area. The Commission also found that the MFJ had divided North Carolina's long distance telecommunication services into five LATAs. Southern Bell was prohibited by the MFJ from carrying traffic beyond those regional geographical limitations. InterLATA services in North Carolina could at the time of that order, be offered only by AT&T-C[8] or "an independent (non-Bell) within its respective service area." Although the Commission noted that the current system was adequate, it also noted that the policy of interstate telecommunications competition had recently been favored by the F.C.C. and the federal courts. The Commission found as fact that authorization of *intra*state *inter*LATA[9] competition by OCCs and resellers *in* North Carolina would be in the public interest if it would not "jeopardize reasonably affordable local service," and that authorization of *intra*state *intra*LATA service[10] would be in the public interest as soon as certain other issues were resolved.

The Commission also found that probably all of the OCCs and resellers appearing in the proceeding were then carrying intrastate intraLATA traffic over their lines, without the Commis-

---

8. AT&T-C is a designation utilized within the former BOC's internal operations that identifies the access line upon which interstate AT&T traffic enters these local exchange company's networks. To accommodate OCCs and resellers, other "feature group" access had to be devised. These other feature groups are designated FGA ("Feature Group A") and FGB ("Feature Group B"). FGA and FGB access has been adjudged inferior to FGC (*i.e.* AT&T-C), and the Commission has reduced the amount of access charge that AT&T competitors must pay to compensate for the deficiency; that reduction amount, however, is not questioned in this appeal.

9. *See* n.2, *supra.*

10. *See* n.3, *supra.*

sion's authority to do so. All the witnesses who testified regarding this unauthorized traffic agreed that "because of the lineside (FGA/FGB) connection currently used by OCCs and resellers, it [was] not practical for the local exchange companies [LECs] to block unauthorized intraLATA calls placed over the network of an OCC or reseller or to reroute such calls automatically over the authorized intraLATA network" as done for AT&T by the LECs.

The Commission determined that since there were unauthorized intraLATA calls flowing over the OCC and reseller lines, and that the LECs who were authorized to carry this traffic were, as a result, losing revenue, the OCCs and the resellers should provide appropriate remunerative compensation to the LECs. The Commission adopted an interim compensation plan for the unauthorized intraLATA calls made over the OCCs' networks. The North Carolina Utilities Commission conducted additional hearings in June, and on 30 September 1985 the Commission entered an Order reaffirming most portions of the 22 February 1985 Order. The Commission reduced the rate of compensation to be paid by the OCCs for the unauthorized intraLATA calls. The Commission specifically found that it is in the public interest for the LECs to be compensated for lost revenues associated with unauthorized transmittal of intraLATA long distance calls by OCCs during the transition period pending the authorization of intraLATA competition by OCCs as of January of 1987. The Order of 30 September 1985 was modified slightly by the Commission in an Order entered on 25 November 1985. In the November Order, the Commission directed that resellers shall also be subject to the compensation plan for transmitting unauthorized intraLATA calls. The Commission established the compensation rate by finding the difference between the amount of toll revenue an LEC would have received if the consumer's call had been properly routed over that licensed LEC's intraLATA exchange system, and the amount of access charge revenue received by the LEC for the call. The appeal of U.S. Sprint and MCI is based largely on whether the Commission has the authority to implement this Interim Compensation Plan, hereinafter the Plan. We hold that the appellants have failed to demonstrate that adoption and implementation of the Plan is in violation of N.C. Gen. Stat. § 62-94; therefore, the decision of the Commission is affirmed.

A. *Appeal of U.S. Sprint*

U.S. Sprint contends that the Plan is contrary to several constitutional provisions, in violation of N.C. Gen. Stat. § 62-94(b)(1), and that the Order was entered in excess of the Commission's statutorily granted authority, in violation of N.C. Gen. Stat. § 62-94(b)(2).

[1]   U.S. Sprint first argues that the compensation requirement will lower its return on investment by increasing its operating expenses. U.S. Sprint contends that because it is denied the "ability to earn a fair return on its investment," the Plan is unlawfully confiscatory and thus a violation of the prohibition against the taking of property without due process.

In support of this contention, U.S. Sprint relies on a United States Supreme Court case, quoting, in part, from the case and arguing that to require a public utility, a railroad in the case cited, to operate at a loss, "would be to take its property without the just compensation which is a part of due process of law." *Railroad Comm. v. Eastern Texas Ry.*, 264 U.S. 79, 85 (1924). We have examined the cited case, especially the passage from which the quote was taken. The full passage reads:

> [If] at any time it develops with reasonable certainty that future operation must be at a loss, the company may discontinue operation and get what it can out of the property by *dismantling the road.* To compel it to go on at a loss, or to give up the salvage value, would be to take its property without the just compensation which is a part of due process of law.

*Id.* (emphasis added). We believe this case is of no benefit to U.S. Sprint.

First, we could find nothing in the record that indicated that U.S. Sprint was being compelled by law to operate in North Carolina at a loss. Nor did we discover any evidence that U.S. Sprint was being *required* to operate at what was an unfair return on its investment. If U.S. Sprint is unsatisfied with the profit margins generated in North Carolina, it is free to "dismantle" its operation in this State. Any statement to the contrary could not be found in the record before us. North Carolina law requires that appellate review of Commission orders be limited to the record as

certified. *Utilities Commission v. Coach Co.*, 261 N.C. 384, 391, 134 S.E. 2d 689, 695 (1964). We have discovered nothing in the record that amounts to an unlawful confiscation or a violation of due process. That argument is therefore without merit.

[2]  U.S. Sprint's primary argument is that the Commission lacks the statutory authority to impose the Plan. It calls the compensation a "penalty" and reasons that N.C. Gen. Stat. § 62-312 specifically provides that an action for the recovery of a penalty must be instituted in the North Carolina state court in Wake County, in the name of the State on the relation of the Utilities Commission "against the person incurring such penalty," by either the Attorney General, the District Attorney of Wake County, or the injured party. U.S. Sprint concludes that since the compensation required by the Plan *amounts* to a penalty, the Commission has violated N.C. Gen. Stat. § 62-94(b)(2) by instituting the Plan. We disagree.

We do not agree that the compensation plan imposes a "penalty" on U.S. Sprint or any other appellant. We note initially that nowhere in the Commission's proceedings is the compensation referred to by the North Carolina Utilities Commission as a penalty. We find it is more appropriately considered as a prerequisite to receiving the certificate.

The North Carolina General Assembly granted the Utilities Commission broad authority to regulate public utilities. N.C. Gen. Stat. § 62-2. The language added to N.C. Gen. Stat. § 62-110 by the General Assembly in 1984 gives great discretion to the Commission in the issuance of certificates to offer long distance service. The Commission is to "consider the impact on local exchange customers" and permit additional service only if the Commission finds that it will not "jeopardize reasonably affordable local exchange service." To accomplish these ends, and "[n]otwithstanding any other provision of law, the terms, conditions, rates and interconnections for long distance services offered on a competitive basis shall be regulated by the Commission in accordance with the public interest." *Id.* We find that the plan requiring compensation to the LECs for lost revenues during the transition period is reasonably calculated to provide protection for the local exchanges who provide needed services to local exchange customers and that the compensation plan is a proper "term" or "condition"

of certification which is consistent with the public interest. The plan is therefore statutorily authorized.

[3]  U.S. Sprint also argues that the Plan violates its right to equal protection of the law. Citing *State v. Greenwood*, 280 N.C. 651, 656, 187 S.E. 2d 8, 11 (1972), U.S. Sprint contends that "[t]he equal protection clauses of the United States and North Carolina Constitutions impose upon lawmaking bodies the requirement that any legislative classification 'be based on differences that are reasonably related to the purposes of the Act in which it is found.' (Citation omitted.)"

On review of the record below, we do not find that the Commission has violated the equal protection rule. Assuming for the sake of argument that U.S. Sprint is correct in its contention that the plan is a "legislative classification," we find that the plan is rationally related to the objective of insuring that the legitimate state objective of providing its citizens with a competitive telecommunications environment beneficial to the individual consumer is accomplished in an equitable manner, "without jeopardizing reasonably affordable local exchange service." N.C. Gen. Stat. § 62-110. The complexity of this objective will almost certainly cause this transitional period to be characterized by inconvenience and inexactitude. Nonetheless, the contention that the Plan is not rationally related to a legitimate state objective is unfounded. We find no violation of the appellant's right to equal protection of the law.

U.S. Sprint's final argument is that the Plan "burdens interstate commerce and unlawfully conflicts with federal antitrust and communications objectives." We turn first to U.S. Sprint's interstate commerce argument.

[4]  We agree with the proposition that a State's exercise of authority which places an undue burden on interstate commerce will, if tested, be declared void even when congressional legislation on the subject is absent. *Hunt v. Washington Apple Advertising Comm.*, 432 U.S. 333, 350, 53 L.Ed. 2d 383, 97 S.Ct. 2434, 2445 (1977). But, it is also true that legislation that merely "may have an impact on interstate commerce" will not always be struck down. *Bibb v. Navajo Freight Lines*, 359 U.S. 520, 523, 3 L.Ed. 2d 1003, 1006, 79 S.Ct. 962, 964 (1959). Considering how little is re-

quired to affect interstate commerce,[11] we are not in a position to state flatly that the plan has no effect on interstate commerce. We can state, however, that any effect is certainly not unduly burdensome. The Plan adopted was temporary and reasonable, and similar plans have worked effectively in other states and have been upheld in similar suits. *See GTE Sprint*, 230 Va. 295, 337 S.E. 2d 702. We find no violation of the interstate commerce clause of the United States Constitution.

[5] We now consider U.S. Sprint's final argument that the plan conflicts with federal antitrust and communications objectives. In support of this argument, U.S. Sprint contends that the plan is in conflict with the provisions of the MFJ. The main thrust of the argument is that because the former BOCs are not providing the OCCs with equal, but rather with inferior, access to local exchanges, the BOCs violate the federal court's directive. *See AT&T*, 552 F. Supp. at 233. An almost identical argument was made by U.S. Sprint (then "GTE Sprint") in the Virginia case. There, the court held:

> There is no merit in the contention of MCI and GTE Sprint that the interim compensation plan violates the provisions of the modification of final judgment (MFJ) and subsequent orders in the AT&T divestiture case. These orders require that the divested operating companies provide equal access to the other carriers and assess all access charges in the form of cost-justified tariffs. MCI and GTE Sprint challenge the plan's formula for payments that are not cost-justified and the plan's exclusion of the payments from the local companies' tariffs. They also assert that the plan violates the equal access requirement by forcing them to pay additional fees for access inferior to that afforded AT&T of Va.
>
> These contentions ignore the fact that the charges imposed by the plan are not access charges. As the Commission noted, access charges cannot compensate for lost revenues. The compensation plan establishes another means of making reimbursement for losses occasioned by unauthorized intra-

---

11. *See, e.g., Katzenbach v. McClung*, 379 U.S. 294, 13 L.Ed. 2d 90, 85 S.Ct. 377 (1964).

LATA usage. Nothing in the MFJ or subsequent related orders requires the local companies to assess access charges for service which is not authorized under state law.

Moreover, intrastate telephone service is exclusively under the jurisdiction of state regulatory agencies. *American Tel.*, 552 F. Supp. at 159 n. 117, 169 & n. 161; *Western Elec.*, 569 F. Supp. at 1005; *see United States v. Western Elec. Co., Inc.*, 569 F. Supp. 1057, 1109 (D.D.C. 1983).

*GTE Sprint*, 230 Va. at 305-06, 337 S.E. 2d at 708-09. Furthermore, even if we assume to be true the allegation that the MFJ has not been adhered to, we are in no position to enforce all provisions of a federal court's directive. *Intra*state telephone service is left to the control of state legislatures and their regulatory agencies. *American Tel.*, 552 F. Supp. at 159 n.117, 169 n.161; *Western Electric*, 569 F. Supp. at 1005; *see also, United States v. Western Electric Company, Inc.*, 569 F. Supp. 1057, 1109 (D.D.C. 1983). The Plan imposed by the North Carolina Utilities Commission to compensate LECs for revenues lost because the appellants were carrying unauthorized *intra*state traffic is a valid regulatory exercise of the authority over intrastate telecommunications. It is this Court's duty to assure that the state agency here in question has acted pursuant to and within its statutory authority. N.C. Gen. Stat. § 62-94. U.S. Sprint has illustrated no defect in the record or in the Orders of the Utilities Commission that would indicate that the implementation of the Plan by the Commission should be deemed by this Court to be unlawful or improper under state law. Any contention that the LECs have failed to comply with the directives of the MFJ should be addressed to the U.S. District Court, which retained jurisdiction to enforce the MFJ. *AT&T*, 552 F. Supp. at 231.

In summary, we find no merit to any of the assignments of error brought forward by appellant U.S. Sprint. We turn next to the assignments of error brought forward by MCI Corporation.

### B.  *Appeal by MCI Corporation*

The appeal of MCI Corporation (MCI) also focuses primarily on the authority of the North Carolina Utilities Commission to implement the compensation plan.

[6] MCI first argues that the plan is an improper award of money damages which the Commission is not statutorily authorized to make. MCI's position is that the Commission, "[i]n ordering the compensation plan, . . . improperly mixed its judicial and legislative activities in an attempt to validate an improper award of money damages to the LECs by couching it in the form of a Commission rule." MCI concludes that the "payment of monies to the LEC by MCI . . . can be valid only if viewed as (a) a validly established tariff rate or charge, or (b) as a valid award of damages." We disagree with the characterization of the compensation plan as money damages and the conclusion that the plan would be valid only if it constituted a tariff or a "valid" award of damages.

We find MCI's argument that the plan constitutes "money damages" essentially the same as U.S. Sprint's argument that the plan amounted to a "penalty." For the reasons expressed earlier in this opinion, we find the compensation plan to be a proper term or condition of certification consistent with the public interest, and not money damages. This assignment is overruled.

[7] MCI next argues that it was denied due process of law because the Commission "render[ed] its 'compensation' decision without providing MCI with proper notice of its intention to consider such a remedy." MCI states in its brief that it was given no notice of the possibility that it might be required to compensate LECs for unauthorized traffic that flowed over its facilities prior to October 1984, the date the hearings were conducted before the Commission to determine whether competitive intrastate offerings of long distance telephone service should be allowed in North Carolina.

Hearings were conducted in Asheville, Charlotte, and Wilmington on 15 October 1984, and in Rocky Mount, Greensboro, and Raleigh on 22 October 1984, and again in Raleigh on 23 October 1984. It was not until 22 February 1985 that the Commission issued its initial order authorizing intrastate competition and establishing the interim compensation plan. On 20 March 1985, MCI filed a petition for reconsideration of the "differential in access charges for long distance telephone services," and for a "grant [of] a 55% access charge differential on both the originating and terminating ends of intrastate long distance telephone calls." The Commission responded to this petition of MCI, and the

petitions of other parties, with an order of 11 April 1985 which set a hearing date for 24 June 1985 to consider "(c) the compensation plan for incidental intraLATA calls adopted by the Commission in the Order Authorizing Intrastate Long-Distance Competition." Subsequent to the hearing in June, the Commission entered the Order reaffirming the interim compensation plan, which became the order appealed by MCI.

At each stage of these proceedings, MCI was present and represented by counsel. Exhaustive hearings were conducted at each step. The record is replete with evidence that a compensation plan was considered from the outset of these hearings. Public Staff witness Hugh L. Gerringer, Jr., testified at the 22 October 1984 hearing that, "if for some reason blocking of intraLATA (unauthorized) calls proves to be infeasible for a particular carrier, that carrier should be required to provide adequate compensation to the local exchange companies for such calls." The Order of 22 February 1985 found as fact that OCCs and resellers should be required "to compensate LECs for revenue losses resulting from the completion of unauthorized intraLATA calls by OCCs or resellers." The Commission then held further hearings before setting the final rate of compensation.

Considering these proceedings, we cannot agree with MCI's contention that its right to due process was denied because it had improper notice. That MCI was not informed prior to the first hearing of what the ultimate decision would be is hardly an adequate contention to support a claim of a due process violation. We find no merit to this contention.

[8]  MCI also argues that the Commission's "purported 'compensation plan' is arbitrary and capricious in form and in substance" because it (MCI) must pay for "unequal access" to local exchanges.[12] MCI insists that Southern Bell's request, granted by the Commission, that it not be required to "provide" equal access

---

12. That the appellants do not have access to all local exchanges equal in quality to AT&T's is clearly established and unrefuted in the record and briefs of the parties. The Commission's recognition of the difference resulted in a 25% reduction of the access tariff on the originating end of the OCC's authorized traffic, which was determined by the Commission to be a "sufficient differential to recognize the differences between FGA/FGB and FGC (AT&T-C) access." The justification or appropriateness of this percentage differential or its reconsideration by the Commission is not questioned in this appeal.

immediately to OCCs, but instead to "provide" such access on a "phased-in basis," while allowing Southern Bell to receive " 'compensation' for a hypothetical gain that it may have failed to realize because of the inadequacies of its own equipment" is an "illogical and unreasonable claim [that] can only be described as arbitrary and capricious." MCI further argues that the Order lacks adequate support in the record.[13] Our review of the record leads us to the conclusion that the Order is not arbitrary and capricious.

> Agency decisions have been found arbitrary and capricious, *inter alia*, when such decisions are "whimsical" because they indicate a lack of fair and careful consideration; when they fail to indicate "any course of reasoning and the exercise of judgment," . . . or when they impose or omit procedural requirements that result in manifest unfairness in the circumstances though within the letter of statutory requirements. . . . "The ultimate purpose of rulemaking review is to insure 'reasoned decisionmaking' . . . ."

*Comr. of Insurance v. Rate Bureau*, 300 N.C. 381, 420, 269 S.E. 2d 547, 573 (1980) (citations omitted). *See Burton v. Reidsville*, 243 N.C. 405, 90 S.E. 2d 700 (1955). The record below is in no way consistent with circumstances justifying the arbitrary and capricious labels. This case involved numerous hearings at which voluminous amounts of evidence were taken. The Commission heard from dozens of witnesses. Although not all the witnesses advocated the decision made by the Commission, there is plenary evidence to support the Commission's findings, conclusions, and orders.[14] That the decision of the Commission may not be the best solution, or the most desirable to all parties, does not reduce the proceedings

---

13. Appellant MCI attempts to establish arbitrariness and capriciousness by offering a comparison of intraLATA revenue generated by Southern Bell in 1983 versus that produced in 1985. Because there is a 15% dollar volume increase in the 1985 figure over 1983, the appellant concludes: "Thus, Southern Bell in fact had no 'lost revenue' due to intraLATA calling on the OCCs [*sic*] facilities." We find this argument frivolous, at best. A 15% increase in dollar volume over a two-year period could be attributed to an increase in customers, traffic volume, or an infinite number of other possibilities.

14. Witnesses from the Public Staff, Southern Bell, Carolina Telephone, and other independent companies, supported adoption of an interim compensation plan. Witness Cherie A. Lucke encouraged adoption of an interim compensation plan

to the level of being deemed arbitrary and capricious. *Id.* at 407, 90 S.E. 2d at 702-03. The contention that the Commission orders are arbitrary and capricious is meritless.

**[9]** MCI's final argument maintains that the Commission's Plan constitutes rate discrimination which is unjust and unreasonable in violation of N.C. Gen. Stat. § 62-140(a). That statute's pertinent part, as quoted in the brief of MCI, reads:

> No public utility shall, as to rates or services, make or grant any unreasonable preference or advantage to any person or subject any person to any unreasonable prejudice or disadvantage. No public utility shall establish or maintain any unreasonable difference as to rates or services either as between localities or as between classes of service.

*Id.* We believe this statute was enacted to prohibit a utility from unreasonable discrimination among *its customers*. We do not believe it was meant to be applied to the North Carolina Utilities Commission's conduct toward various public utilities, as MCI apparently contends. MCI offered no case in support of its position, and we could fine none. Consequently, we find no merit in MCI's argument.

C.  *Argument by North Carolina Long Distance Association*

We now turn our attention to the brief submitted by the North Carolina Long Distance Association (NCLDA). In its brief, NCLDA called itself an "appellee." Yet, NCLDA made arguments for the reversal of the Commission's order, making essentially the same arguments as appellants U.S. Sprint and MCI. NCLDA did not enter notice of appeal and did not place any assignments of error in the record. The argument of NCLDA is subject to dismissal under Rules 18 and 28 of the Rules of Appellate Procedure. Under Rule 2 of the Rules of Appellate Procedure, we have elected not to dismiss NCLDA's brief for Rule violations. Instead, we have considered the arguments made therein, and we find that

---

similar to that adopted by the Virginia State Corporation Commission "to ensure that LECs are compensated for any incidental intraLATA traffic that ICs (IXCs) may have." The appellant's witnesses supported a contrary position. Nonetheless, any factual finding by the Commission supported by "competent, material and substantial evidence" must remain undisturbed by this Court on appeal. *The Public Staff,* 317 N.C. at 34, 343 S.E. 2d at 903.

NCLDA has failed to raise any issues, other than those raised by U.S. Sprint and MCI, which merit any discussion. The assignments of error argued by NCLDA are overruled.

### D. *Summary*

A decision of the North Carolina Utilities Commission is to be upheld on appeal unless the appellate court finds error based on one of the enumerated grounds of N.C. Gen. Stat. § 62-94(b). *Utilities Comm. v. Telephone Co.*, 35 N.C. App. 588, 591, 242 S.E. 2d 165, 166 (1978), *aff'd*, 298 N.C. 162, 257 S.E. 2d 623 (1979). Appellate reversal of "an order of the Utilities Commission is a serious matter for the reviewing court which can be properly addressed only by strict application of the six criteria which circumscribe judicial review." *Utilities Comm. v. Oil Co.*, 302 N.C. 14, 20, 273 S.E. 2d 232, 235 (1981) (footnote omitted). We have carefully considered all of the arguments made by U.S. Sprint, MCI, and NCLDA, and we find no grounds for reversal. The Order of the Utilities Commission in Case No. 8610UC427 is affirmed.

### IV.

### CASE NO. 8610UC610

The second appeal considered herein arises from a further order of the Utilities Commission in the same proceedings considered above, *i.e.*, the Commission's implementation of long distance competition in the North Carolina telecommunications market. After the Commission entered its Order of 30 September 1985 (as amended by Order of 25 November 1985), which was the subject of the appeal in Case No. 8610UC427, the Commission held another hearing on various issues not resolved by the prior orders. The Commission entered an Order on 19 December 1985 authorizing intrastate intraLATA competition through the resale of intraLATA LEC WATS and MTS. The Order also continued the compensation plan for unauthorized intraLATA calls, ordered that resellers be subject to the compensation plan, and directed that LECs prepare and file access tariffs. MCI and NCLDA filed notice of appeal. The appeal of the Order of 19 December 1985 constitutes Case No. 8610UC610.

A.  *Appeal of North Carolina Long Distance Association*

Two specific portions of that order are challenged by NCLDA: first, that ordering resellers to pay intraLATA access charges is unlawful; and second, that the intraLATA Interim Compensation Plan as adopted by the Commission and applied to the resellers is unlawful.

In the findings of fact, the Commission found that it was "in the public interest that the intraLATA compensation plan continue in effect as to intraLATA calls completed by long-distance carriers (other than LECs) over facilities other than resold intrastate WATS and MTS of the LECs." The Commission further found as fact that it was "appropriate and in the public interest for switched access charges (including the carrier common line charge) to apply to intraLATA access minutes and said access charges should be set at the same level as interLATA access charges." The LECs and the Public Staff, pursuant to the Commission's 22 February 1985 requirement, proposed implementation of provisional access charges to apply to the resellers in the same amount as those currently in effect on a provisional basis for interLATA access of the OCCs, because the "resellers' use of the local exchange network for collection of traffic to resell *intra*LATA MTS and WATS [was] identical to their use in the resale of *inter*LATA MTS and WATS." Despite the arguments of MCI and NCLDA to the contrary, the Commission concluded "that since the resellers' use of the network is the same regardless of whether the call is interLATA or intraLATA, the access charges for each should be the same."

In its brief, NCLDA contends that application of intraLATA access charges to resellers is unlawful, and that application of the intraLATA Compensation Plan to resellers is unlawful.

1.  Lawfulness of Application of *Intra*LATA
Access Charges to Resellers

In order to provide LEC access to all post-divestiture IXCs, the LECs needed to devise and construct special access facilities to accommodate certain IXCs. At the 2 October 1985 hearing, Raymond L. Slazyk, Jr., testified as a witness for AT&T that "[t]he appropriate mechanism to recover the costs of these additional facilities [was] to apply the LEC's approved tariffed charges

for special access services." Slazyk summarized his testimony by stating his company's position as being

> that if a long distance provider uses *additional* LEC facilities in providing the services, those facilities should be paid for by that long distance provider. The appropriate charges for the use of those additional facilities should be access charges. The same access charges that are paid by other long distance providers. (Emphasis added.)

The Commission, consistent with the testimony of Slazyk and other witnesses, ordered that *intra*LATA access charges be applied to resellers. NCLDA challenges the lawfulness of the Commission's orders regarding access charges for resellers on two grounds.

[10] NCLDA first argues that the Commission exceeded its authority in ordering *intra*LATA access charges because the Commission is not empowered to provide any LEC a revenue increase without first satisfying the prerequisites articulated in N.C. Gen. Stat. § 62-133, the statute governing the fixing of rates by the Commission. NCLDA contends that, since the resellers were, by these Commission orders, required to make payments to the LECs, the LECs were in effect being granted a revenue increase without considering relevant evidence and concluding that additional revenues are needed for a utility to earn a fair rate of return on the fair value of its assets, as the Commission is directed to do by N.C. Gen. Stat. § 62-133(b)(4).

Considering the evidence supporting the view that the access charge tariff is calculated to reimburse LECs for their having to provide OCCs and resellers with additional connection facilities to the LECs' local networks, we believe the payments should not be viewed as mere increased revenues for the LECs. A fair reading of the record demonstrates that the Commission intended the access charge tariff to provide funds to set off those expenditures that the LECs were required to make to provide additional facilities to handle additional IXC carrier access. We believe the imposition of the access charge tariff is within the authority the General Assembly granted to the Commission in the 1984 amendments to N.C. Gen. Stat. § 62-110, which we discussed *supra*. We hold that the imposition of the access charge tariff is authorized under that statute.

The second portion of NCLDA's argument on the Commission's authorization of access charges contends that the Order was not supported by the evidence and was arbitrary and capricious, in violation of NCLDA's rights to due process. We disagree. We have reviewed the entire record to determine whether the Order is supported by competent, material, and substantial evidence, as we are directed to do under N.C. Gen. Stat. § 62-94. We find that issuance of the access charge tariff is fully and properly supported by the record, and this Court shall not substitute its judgment for that of the Commission. *State ex rel. Utilities Comm. v. Southern Bell*, 57 N.C. App. 489, 496, 291 S.E. 2d 789, 793 (1982), *modified and aff'd*, 307 N.C. 541, 299 S.E. 2d 763 (1983).

The access charge tariff has necessarily evolved because the federal court mandated today's competitive telecommunications environment. The access charge tariff is essentially a customer charge with which LECs determine the monetary amount due for providing line access to the public, including businesses, individuals, and now, other telecommunications companies. The record is replete with testimony supporting a factual finding that access charge tariffs were designated to "reflect accurately the actual usage of LEC facilities by the resellers and OCCs." Similarly, evidence that OCCs and resellers use LEC networks to the same extent is equally supported. *See* 2 October 1985 Hearing, Vol. 1, pp. 23, 75-76.

We are thus of the opinion that no portion of the Commission's order is "whimsical," lacking "fair and careful consideration," or illustrates "manifest unfairness." *N.C. Rate Bureau*, 300 N.C. at 420, 269 S.E. 2d at 573. We hold that the Commission Orders are therefore not arbitrary and capricious.

### 2. Lawfulness of the *Intra*LATA Compensation Plan As Applied to Resellers

[11] In challenging the application of the plan to resellers, NCLDA first argues that because the Plan is "an exact parallel to the equalization plan ordered by the N.C. Milk Commission," which was held unconstitutional, the Plan must likewise be struck down. We disagree.

The case upon which the appellants rely is *In Re Arcadia Dairy Farms*, 43 N.C. App. 459, 259 S.E. 2d 368 (1979). That case

invalidated a statute giving the Milk Commission the authority to assess an equalization payment to certain milk distributors. The assessment there was made pursuant to regulations adopted by the Milk Commission, one of which required "a distributor of Class I recombined or reconstituted milk to pay the difference between the prices of Class I and Class II milk on reconstituted milk obtained from non-state based producers or other unapproved sources." *Id.* at 460, 259 S.E. 2d at 369. In striking down the statute, this Court followed *In Re Dairy Farms*, 289 N.C. 456, 223 S.E. 2d 323 (1976), where our Supreme Court, through Justice Lake, stated:

> Quite clearly, there is, at least, serious doubt that G.S. 106-266.8, if construed to authorize the Commission to require the distributor of milk, "reconstituted" from Wisconsin milk powder, to make compensatory payments to North Carolina milk producers, can be reconciled with the Commerce Clause of the Constitution of the United States.
>
> \*   \*   \*   \*
>
> *Arcadia obtains nothing in return for the payment it is required to make by the order of the Commission.* It is required to make such payment to its competitor distributors from whom it elected to purchase nothing, for the benefit of producers from whom it purchased nothing. Likewise, the Commission, by this order, has not undertaken to supervise or regulate the processing of "reconstituted" milk or its sale. Its order has nothing whatever to do with the selection of the ingredients which go into Arcadia's "reconstituted" milk and nothing whatever to do with Arcadia's method of processing such milk. The order leaves Arcadia free to sell its "reconstituted" milk. There is no contention that such milk is not wholesome, that Arcadia is representing it to its customers as anything other than that which it is, or that Arcadia, in the sale of its "reconstituted" milk is engaged in unlawful price cutting or other unfair trade practices. The sole purpose and effect of the Commission's order is to require Arcadia to pay to its competitors, for the benefit of producers with whom Arcadia has no dealings, an amount equal to the difference between the price those producers receive for the milk delivered to those distributors and the price they would

have received for such milk had Arcadia purchased from those distributors the milk sold to them by those producers.

*Id.* at 469-71, 223 S.E. 2d at 331-32 (emphasis added).

We find the factual circumstances and legal conclusions in *In Re Dairy Farms* easily distinguishable from the compensation plan at issue here. The Plan here is designed to compensate LECs for revenues lost due to the transmission of unauthorized traffic over the facilities of OCCs and those lines "rented" by resellers. The plan is not designed to protect North Carolina companies from competition; rather, it is a temporary device calculated to compensate authorized LECs for *loss of revenue* to unauthorized intraLATA telecommunications carriers during the relatively brief period of transition to a competitive marketplace. The difference between the Plan at issue here, and the Milk Commission's rule requiring payment from out-of-state processors to in-state processors apparently just to even out prices, is readily apparent. We find no merit to NCLDA's argument.

The remaining arguments presented by NCLDA argue points previously considered in other parts of this opinion. We find it unnecessary to restate those contentions and our disposition of them.

### B.  *Appeal of MCI Corporation*

MCI does not dispute the authority of the Utilities Commission to require payment of access charges to the LECs. In the first sentence of the argument in its brief, MCI concedes that "the Commission clearly has authority to establish rates for services provided by the LECs, such as access services provided pursuant to the North Carolina access tariffs . . . ." MCI's brief focuses instead on the Commission's authority to impose upon resellers an interim compensation plan.

In its brief, MCI brings forward arguments very similar to the arguments it made in Case No. 8610UC427 above; in fact, more than half its brief is a verbatim copy of the brief submitted in the first case. In that portion of the brief that is not a verbatim copy, no new issues meriting discussion are raised. Thus, we find that MCI has failed to present reasons sufficient to reverse the Order of the North Carolina Utilities Commission.

## C.  *Summary*

We have carefully considered all of the arguments by MCI and NCLDA, and we find no basis for reversal of the Commission's Order in Case No. 8610UC610. The Order is affirmed.

## V.

### CONCLUSION

Having found no grounds for reversal of the Orders of the North Carolina Utilities Commission presented for review in Cases Nos. 8610UC427 and 8610UC610, we hold the Orders are

Affirmed.

Judges MARTIN and ORR concur.