STATE ex rel. UTILITIES COMM. v. PIEDMONT NAT. GAS CO.

[346 N.C. 558 (1997)]

STATE OF NORTH CAROLINA ex rel. UTILITIES COMMISSION, FRONTIER UTILI-
TIES OF NORTH CAROLINA, INC. (APPLICANT-INTERVENOR), THE PUBLIC
STAFF—NORTH CAROLINA UTILITIES COMMISSION (INTERVENOR), AND
MICHAEL F. EASLEY, ATTORNEY GENERAL (INTERVENOR) v. PIEDMONT
NATURAL GAS COMPANY, INC. (APPLICANT-INTERVENOR)

No. 252PA96

(Filed 24 July 1997)

1. **Utilities § 321 (NCI4th)— appellate review—substantial
   evidence test**

   In reviewing a decision by the Utilities Commission, it is not
   the function of the appellate court to determine whether there is
   evidence to support a position the Commission did not adopt.
   Rather, the test is whether, in view of the entire record, the
   Commission's findings and conclusions are supported by sub-
   stantial, competent, and material evidence.

   **Am Jur 2d, Administrative Law §§ 211, 521, 522, 530,
   542.**

   **Supreme Court's views as to what constitutes factual
   issue under "clearly erroneous" standard of Federal Rule
   of Civil Procedure 52(a), providing that findings of fact
   shall not be set aside unless clearly erroneous. 72 L. Ed. 2d
   890.**

2. **Utilities § 321 (NCI4th)— credibility of testimony—
   Utilities Commission decision—presumption of considera-
   tion of competent evidence**

   The credibility of the testimony and the weight to be
   accorded it are for the Utilities Commission to decide, and the
   appellate court will presume that the Commission gave proper
   consideration to all competent evidence presented.

   **Am Jur 2d, Administrative Law §§ 211, 521, 522, 530,
   542.**

   **Supreme Court's views as to what constitutes factual
   issue under "clearly erroneous" standard of Federal Rule
   of Civil Procedure 52(a), providing that findings of fact
   shall not be set aside unless clearly erroneous. 72 L. Ed. 2d
   890.**

STATE ex rel. UTILITIES COMM. v. PIEDMONT NAT. GAS CO.

[346 N.C. 558 (1997)]

3. **Utilities § 48 (NCI4th)— natural gas service—two applicants—proposed sources of funding—supporting evidence for certificate award**

The Utilities Commission did not act arbitrarily and capriciously by giving the greatest weight to the proposed sources of funding in deciding between two applicants for a certificate of public convenience and necessity to provide natural gas service to a four-county area. Furthermore, there was substantial evidence in the record to support the Utilities Commission's award of the final certificate to a newly formed local distribution company (Frontier) rather than to a previously existing company (Piedmont) where Frontier proposed to use traditional financing and Piedmont was unwilling to provide the service without expansion fund financing; the Commission found that it would be inappropriate under N.C.G.S. § 62-158 to allow expansion funds to be used if a feasible alternative was available; credible evidence was presented that it was feasible to provide natural gas service to the area using traditional rather than expansion fund financing; the Commission found that both Piedmont and Frontier had made a *prima facie* case that they were qualified and capable of providing natural gas service to the area; Frontier proposed a much more extensive rural distribution system than did Piedmont and had a much shorter construction schedule; the Commission considered the rights, interests, and preferences of the citizens of the four-county area; and although Piedmont's proposed rates were lower, Frontier's proposed rates were considerably less than the cost of alternative energy sources.

Am Jur 2d, Public Utilities §§ 323-330.

Requirement that public contract be awarded on competitive bidding as applicable to contract for public utility. 81 ALR3d 979.

4. **Utilities § 233 (NCI4th)— natural gas service—two applicants—procedures and evidence rulings**

The Utilities Commission's procedures for receiving evidence from both applicants for a certificate of public convenience and necessity to provide natural gas service to a four-county area (Frontier and Piedmont) and its rulings with regard to the admissibility of that evidence were proper where the Commission established prefiling dates for the filing of testimony, exhibits, and rebuttal testimony; supplemental evidence filed by Piedmont

STATE ex rel. UTILITIES COMM. v. PIEDMONT NAT. GAS CO.

[346 N.C. 558 (1997)]

in the nature of rebuttal of the Public Staff's testimony was admitted, and new evidence in the nature of additional direct testimony was excluded; the Commission noted that the ruling did not foreclose the consideration of the excluded evidence at a later time, but Piedmont never tendered the evidence again; evidence offered by Piedmont to show that it could finance the project without using an expansion fund was later contradicted by Piedmont's letter declining a conditional certificate on the ground that Piedmont considered the project to be financially infeasible without the use of an expansion fund; the Commission issued a conditional certificate to Frontier and required Frontier to meet ten conditions for a final certificate; Frontier filed testimony and exhibits to show that these conditions had been met; and Piedmont was given the opportunity to offer evidence to contradict this additional information but declined to do so. Piedmont was given notice at all stages of the proceeding and was given the same opportunities as Frontier to present direct, supplemental, and rebuttal evidence.

**Am Jur 2d, Administrative Law §§ 350, 353, 371; Evidence § 470; Public Utilities §§ 323-330.**

5. **Utilities § 48 (NCI4th)— certificate for natural gas service—reason distribution company formed—finding supported by evidence**

Substantial evidence supported a finding by the Utilities Commission that a new local distribution company was formed to develop a rural natural gas system to provide service to four counties where the new company first applied for a certificate to serve only three counties because it did not wish to oppose an existing company in the fourth county, and the new company filed its application to serve all four counties after the existing company applied to serve all four counties.

**Am Jur 2d, Administrative Law §§ 414, 522, 537; Public Utilities §§ 317, 329, 330.**

6. **Utilities § 48 (NCI4th)— certificate for natural gas service—length of distribution system—finding supported by evidence**

Substantial evidence supported the Utilities Commission's finding that an applicant's proposed natural gas distribution system was in excess of 428 miles, despite a finding by the

Commission in an earlier order that the applicant's proposed project included 718 miles of distribution main.

**Am Jur 2d, Administrative Law §§ 414, 522, 537; Public Utilities §§ 317, 329, 330.**

7. **Utilities § 48 (NCI4th)— certificate for natural gas service—length of applicant's distribution main—finding supported by evidence**

A finding by the Utilities Commission that a previously existing local distribution company proposed to construct only 215 miles of natural gas distribution main was supported by testimony of the company's own witness that the core system of 215 miles described in the company's application would be the complete system installed to serve area customers.

**Am Jur 2d, Administrative Law § 542.**

8. **Utilities § 27 (NCI4th)— certificate for natural gas service—competing applicants—expansion fund**

The evidence supported the Utilities Commission's finding that Piedmont's proposal to provide natural gas service to a four-county area was contingent upon 30% or more of the capital being provided from an expansion fund where Piedmont's certificate application requested approval to use an expansion fund to finance the project, and Piedmont declined a conditional certificate on the ground that it was not economically feasible to construct and operate the project without the use of expansion funds. Furthermore, there was no merit to Piedmont's argument that it was not provided the same opportunities as the competing applicant (Frontier) to demonstrate that the project could be completed with traditional financing where Frontier proposed *ab initio* to use only traditional financing, whereas Piedmont originally requested the use of expansion funds and never waivered from that position.

**Am Jur 2d, Administrative Law §§ 414, 522, 537; Public Utilities §§ 323-330.**

9. **Utilities § 27 (NCI4th)— certificate for natural gas service—competing applicants—traditional versus expansion fund financing—necessity for granting certificate to traditional financing applicant**

The evidence supported the Utilities Commission's finding that its failure to grant a final certificate to Frontier to provide

562        IN THE SUPREME COURT

STATE ex rel. UTILITIES COMM. v. PIEDMONT NAT. GAS CO.

[346 N.C. 558 (1997)]

natural gas service to a four-county area would likely result in no natural gas being available in these counties in the foreseeable future, notwithstanding Piedmont has also applied to serve this area, where Piedmont refused to provide service to this area without the use of expansion funds, and the Commission concluded that it would be inappropriate under N.C.G.S. § 62-158 to allow expansion funds because traditional financing is feasible.

**Am Jur 2d, Administrative Law §§ 414, 522, 537; Public Utilities §§ 323-330.**

**10. Utilities § 48 (NCI4th)— certificate for natural gas service—competition for corporate resources—finding supported by evidence**

The evidence supported the Utilities Commission's finding that a four-county area would have to compete for limited corporate resources if Piedmont is granted the certificate to provide natural gas service to this area where Piedmont's self-documented current customer growth rate is among the highest nationally, and the area would have to compete with Piedmont's currently franchised markets for construction expenditures.

**Am Jur 2d, Administrative Law §§ 414, 522, 537; Public Utilities §§ 323-330.**

**11. Utilities § 254 (NCI4th)— certificate for natural gas service—market study—substantial compliance with proposal—admissibility**

While an independent market study required as a condition of a final certificate for providing natural gas service to a four-county area differed from Frontier's initial proposal with regard to the pace of construction and development of the distribution system, the study was in substantial compliance with Frontier's preliminary proposal, and the Utilities Commission properly denied Piedmont's motion to dismiss Frontier's filing of the study, where the study covers basically the same geographic service area, serves the same markets, uses the same rate structure, involves the same construction and engineering issues, and costs approximately the same.

**Am Jur 2d, Administrative Law §§ 350, 353.**

**12. Utilities § 27 (NCI4th)— certificate for natural gas service—expansion fund—franchise areas**

Any proclaimed right a local distribution company has to the creation and use of an expansion fund is limited to those areas in which it possesses a certificate of public convenience and necessity and does not extend to unfranchised areas which are the subject of competing certificate applications. N.C.G.S. § 62-158.

**Am Jur 2d, Franchises § 62; Pipelines § 22; Public Utilities § 329**

**13. Utilities § 27 (NCI4th)— certificate for natural gas service—competing applicants—traditional rather than expansion fund financing—public interest and policy goals**

The Utilities Commission could properly determine that the method of financing of natural gas service for a four-county area takes precedence over the limited differential between the rates proposed by Piedmont versus those proposed by Frontier and that it is in the public interest and in accordance with the policy goals of this state to pursue gas expansion through traditional rather than expansion fund financing if such an alternative is reasonably available.

**Am Jur 2d, Public Utilities §§ 201, 326.**

**Requirement that public contract be awarded on competitive bidding as applicable to contract for public utility. 81 ALR3d 979.**

**14. Utilities § 27 (NCI4th)— certificate for natural gas service—competing applicants—economic feasibility—expansion funds—net present value method not required**

The Utilities Commission did not improperly fail to employ the net present value (NPV) method of analysis to determine whether extension of natural gas service into a four-county area was economically feasible pursuant to N.C.G.S. § 62-158(c) since (1)the Commission must apply the NPV method only in evaluating the feasibility of a single proposal, not when there are competing applicants, one of which conclusively demonstrates the economic feasibility of a project using traditional rather than expansion fund financing; and (2) the record indicates that one applicant (Piedmont) repeatedly asserted that the extension of natural gas service into the four-county area had a negative NPV and could only be accomplished with the aid of expansion funds,

STATE ex rel. UTILITIES COMM. v. PIEDMONT NAT. GAS CO.

[346 N.C. 558 (1997)]

whereas the second applicant (Frontier) demonstrated with empirical data and studies that a positive NPV project was possible.

**Am Jur 2d, Public Utilities §§ 138, 197.**

On discretionary review pursuant to N.C.G.S. § 7A-31, prior to a determination by the Court of Appeals, of a final order of the North Carolina Utilities Commission entered 30 January 1996 in Docket Nos. G-38 and G-9, Sub 357, and of previous orders upon which the final order is based. Heard in the Supreme Court 15 November 1996.

*Petree Stockton, L.L.P., by James P. Cain, M. Gray Styers, Jr., and Teresa DeLoatch, for applicant-intervenor-appellee Frontier Utilities of N.C.*

*Robert P. Gruber, Executive Director, by Gisele L. Rankin, Staff Attorney, for intervenor-appellee the Public Staff.*

*Michael F. Easley, Attorney General, by J. Mark Payne, Assistant Attorney General, intervenor-appellee.*

*Amos & Jeffries, L.L.P., by Jerry W. Amos and Russell M. Robinson, III, for applicant-intervenor-appellant Piedmont Natural Gas Co.*

*Simpson Aycock, P.A., by Dan R. Simpson, on behalf of Representative George M. Holmes, Representative Rex L. Baker, Representative John W. Brown, Representative Bill S. Hiatt, Representative Gene Wilson, Senator Daniel R. Simpson, Senator Donald R. Kincaid, Senator Don W. East, and Senator Virginia Ann Foxx, amici curiae.*

WHICHARD, Justice.

This appeal involves competing applications filed by Frontier Utilities of North Carolina, Inc. (Frontier) and Piedmont Natural Gas Company, Inc. (Piedmont) to provide natural gas service to Surry, Wilkes, Watauga, and Yadkin Counties (Four-County area).

On 23 September 1994 Frontier, a newly formed local distribution company (LDC), filed an application for a certificate of public convenience and necessity to construct, own, and operate an intrastate pipeline facility and local distribution system and for establishment of rates for that system. Frontier requested authority to serve the Four-County area. On 27 September 1994 Piedmont also filed an

STATE ex rel. UTILITIES COMM. v. PIEDMONT NAT. GAS CO.

[346 N.C. 558 (1997)]

application seeking a certificate to serve the Four-County area or, in the alternative, a declaration that Piedmont's existing certificates authorize it to construct the necessary facilities to extend natural gas service to the unserved counties. Frontier proposed to fund its project with traditional debt and equity financing. Piedmont's application indicated that expansion of service into the Four-County area would be economically feasible only if Piedmont could use funds from an expansion fund.[1] Piedmont subsequently filed a petition requesting authority to use expansion funds for a project to serve the Four-County area.

By order dated 21 October 1994, the Commission consolidated the two applications for hearing, required public notice, and established intervention and filing deadlines. A public hearing was set for 1 December 1994 in Wilkesboro, with the hearing continuing in Raleigh on 31 January 1995. The Commission invited briefs on the question of whether Piedmont was entitled to extend natural gas service to the Four-County area under its existing certificates as territory contiguous to territory Piedmont already occupied. The Commission ultimately concluded that there was considerable "unoccupied" territory between those areas already serviced by Piedmont and the unserved Four-County area. The Commission therefore denied Piedmont's alternative claim for authority to serve the Four-County area pursuant to the "contiguous" proviso of N.C.G.S. § 62-110(a).

Forty-eight persons testified as public witnesses at the hearing in Wilkesboro. During the second phase of the hearing in Raleigh, seven more public witnesses testified in addition to testimony presented by Piedmont, Frontier, and the Public Staff. At the conclusion of this hearing, the Commission ordered the Public Staff to file by 21 February 1995 supplemental testimony setting forth its recommendation. On 6 March 1995 Piedmont filed supplemental rebuttal testimony relating to Frontier's inability to adequately service the Four-County area and relating to the desires of the citizens of the area. The hearing subsequently reconvened on 7 March 1995 to receive the supplemental testimony and recommendation of the Public Staff. Frontier objected to the majority of the supplemental evidence offered by Piedmont on the grounds that it was new, direct evidence. The Commission sustained the objection and limited presentation of

1. Expansion fund financing involves the use of refunds from gas suppliers or other sources for construction of appropriate and authorized natural gas facilities that otherwise would not be feasible, pursuant to N.C.G.S. § 62-158.

evidence to evidence intended to rebut the testimony of the Public Staff. Thereafter, the Public Staff recommended that Frontier be awarded a certificate, conditioned upon Frontier's submitting ten specified studies, analyses, and other evidence, and that a further hearing be scheduled for the limited purpose of determining whether Frontier satisfied these conditions.

Contrary to the recommendation of the Public Staff, the Commission issued an order on 19 June 1995 giving Piedmont the option of accepting a certificate subject to the condition, *inter alia,* that Piedmont would not use any expansion funds for construction of the Four-County area project. The condition was based on the Commission's conclusion that allowing the construction of a project using expansion fund financing when adequate service could be provided without resort to such nontraditional financing was inconsistent with the legislative intent expressed in N.C.G.S. § 62-158. By letter filed 10 July 1995, Piedmont declined to accept the conditional certificate, stating that it could not construct a safe, reliable, and economically viable transmission and distribution system in the Four-County area without the use of expansion funds.

On 20 July 1995 the Commission issued an order granting a conditional certificate to Frontier and scheduling a further hearing. The Commission required Frontier to complete and file ten specified items, including market and economic feasibility studies conducted by an independent consultant, information concerning system design, gas supply and capacity arrangements, construction contracts, and financing plans. A hearing limited to whether Frontier had met the conditions was scheduled to commence 12 December 1995.[2]

Frontier timely filed testimony and exhibits in satisfaction of the ten conditions on 18 October 1995. On 7 November 1995 Piedmont filed a motion to dismiss the filing on the grounds that Frontier's market study evaluated a proposal substantially different than Frontier's original proposal. The Commission deferred ruling pending the 12 December hearing already scheduled. During November a number of towns, economic development groups, and individuals filed petitions to intervene. The Commission denied these petitions on the grounds

2. Piedmont attempted to appeal this order by notice of appeal filed 18 August 1995. Piedmont filed the settled record on appeal for this appeal on 5 December 1995. On 6 December 1995 Frontier filed a motion to dismiss and a supporting brief. The Public Staff and the Attorney General filed similar motions on 8 December and 12 December 1995, respectively. By order dated 3 January 1996, the Court of Appeals dismissed the appeal as interlocutory.

STATE ex rel. UTILITIES COMM. v. PIEDMONT NAT. GAS CO.

[346 N.C. 558 (1997)]

that they were untimely and would result in delay in the proceedings. The order provided, however, for additional public witness testimony, and any persons and groups who filed petitions to intervene were permitted to testify as public witnesses.

The second phase of the proceedings came on for hearing on 12 December 1995 as scheduled. The Commission issued a prehearing order stressing that the 12 December hearing would be limited to the issue of the adequacy of the information filed by Frontier in satisfaction of the ten conditions enumerated in the conditional certificate granted to Frontier. Nine public witnesses testified at the hearing. Frontier and the Public Staff presented the testimony of four and three witnesses, respectively. On 30 January 1996 the Commission issued an order awarding a final certificate to Frontier to provide natural gas service to the Four-County area.

On 28 February 1996 Piedmont requested a rehearing of the 30 January order and an opportunity for oral argument on this request. The Commission denied the request without hearing oral argument. On 15 March 1996 Piedmont filed its notice of appeal of the Commission orders that culminated in the 30 January order granting a final certificate to Frontier. The record on appeal was filed with the Court of Appeals on 28 May 1996. On 26 June 1996 this Court allowed petitions by Frontier, the Public Staff, and Piedmont for discretionary review prior to a determination by the Court of Appeals.

Piedmont first challenges two substantive aspects of the Commission's findings of fact and resulting conclusions of law. Piedmont argues that the Commission erred by failing to consider the expressed preferences of the citizens of the Four-County area and by failing to adopt any findings of fact or conclusions of law with respect to this public sentiment. Piedmont asserts that recognition of customer preferences enhances economic development and is therefore of paramount importance to the decision of awarding a certificate of public convenience and necessity. Here, public testimony weighed heavily in support of Piedmont's serving the Four-County area. Piedmont received the overwhelming support of the public witnesses who testified; the nine legislators who represent the Four-County area determined that the public interest favored Piedmont; and the Yadkin County, Surry County, Town of Wilkesboro, and Town of Mount Airy Commissioners all determined that Frontier's higher rates would adversely affect economic development in their respective communities. Piedmont contends that, despite this overwhelm-

ing support, the Commission did not make a single finding of fact with respect to consumer preferences.

Piedmont also argues that the Commission's decision to award the final certificate to Frontier is compromised by the Commission's own finding that Piedmont is the best-qualified applicant to provide natural gas service to the Four-County area. In its 19 June 1995 order, the Commission found as factors favorable to Piedmont that (1) Piedmont has lower rates and more experience than Frontier, as well as an existing, large customer base; (2) Piedmont has an extensive operations and maintenance training program and is well equipped to handle emergency situations; (3) Piedmont has a diverse, well-balanced portfolio of gas supplies already under contract, enabling it to provide reliable service to the Four-County area; and (4) Piedmont is in a superior position to absorb the losses if demand for gas is less than projected. Piedmont argues that the Commission's disregard of its own prior determinations of which utility could best serve the Four-County area, as well as neglect of public testimony, constitutes error of law requiring reversal of the 30 January 1996 order awarding the certificate to Frontier and reissuance of the Commission's 19 June 1995 order granting a certificate to Piedmont.

North Carolina General Statutes section 62-110 requires that any entity desiring to provide a public utility service must obtain a certificate of public convenience and necessity from the Commission prior to beginning the construction or operation of a public utilities facility. N.C.G.S. § 62-110(a) (1989). "[W]hat constitutes 'public convenience and necessity' is primarily an administrative question with a number of imponderables to be taken into consideration." *State ex rel. Utilities Comm'n v. Carolina Coach Co.*, 260 N.C. 43, 52, 132 S.E.2d 249, 255 (1963) (quoting *Utilities Comm'n of N.C. v. Great Southern Trucking Co.*, 223 N.C. 687, 690, 28 S.E.2d 201, 203 (1943)). "The convenience and necessity required are those of the public and not of an individual or individuals." *Id.* Therefore, in adjudicating between two competing certificate applicants, it is for the Commission to weigh and balance a myriad of factors in an effort to protect the interests and welfare of the general public.

[1],[2] The scope of appellate review of a decision by the Commission is provided in N.C.G.S. § 62-94. The reviewing court

may reverse or modify the decision if the substantial rights of the appellants have been prejudiced because the Commission's findings, inferences, conclusions or decisions are:

STATE ex rel. UTILITIES COMM. v. PIEDMONT NAT. GAS CO.

[346 N.C. 558 (1997)]

(1) In violation of constitutional provisions, or

(2) In excess of statutory authority or jurisdiction of the Commission, or

(3) Made upon unlawful proceedings, or

(4) Affected by other errors of law, or

(5) Unsupported by competent, material and substantial evidence in view of the entire record as submitted, or

(6) Arbitrary or capricious.

N.C.G.S. § 62-94(b) (1989). It is not the function of this Court to determine whether there is evidence to support a position the Commission did not adopt. *State ex rel. Utilities Comm'n v. Eddleman*, 320 N.C. 344, 355, 358 S.E.2d 339, 347 (1987). Rather, the test is whether, in view of the entire record, the Commission's findings and conclusions are supported by substantial, competent, and material evidence. *Id.* The credibility of the testimony and the weight to be accorded it are for the Commission to decide, *State ex rel. Utilities Comm'n v. City of Durham*, 282 N.C. 308, 322, 193 S.E.2d 95, 105 (1972), and this Court presumes that the Commission gave proper consideration to all competent evidence presented, *State ex rel. Utilities Comm'n v. Thornburg*, 316 N.C. 238, 245, 342 S.E.2d 28, 33 (1986). This Court may not properly set aside the Commission's recommendation merely because different conclusions could have been reached from the evidence. *State ex rel. Utilities Comm'n v. General Tel. Co. of Southeast*, 281 N.C. 318, 354, 189 S.E.2d 705, 728 (1972).

[3] With these principles in mind, we consider whether there is substantial evidence, in view of the entire record, to support the position the Commission adopted. The Commission determined that Frontier, rather than Piedmont, should be awarded the final certificate of public convenience and necessity to provide natural gas service to the Four-County area. The decision ultimately turned on whether use of an expansion fund pursuant to N.C.G.S. § 62-158 was appropriate where credible evidence had been presented that adequate service could be provided to the Four-County area without resort to such nontraditional financing. The Commission concluded that "to the extent it has been demonstrated that adequate service can be provided to unserved counties using traditional financing, state law and policy require that the feasible option be pursued." In support of this

conclusion, the Commission relied upon the following evidence, findings of fact, and conclusions of law.

The Commission first emphasized that "it would be inappropriate and inconsistent with the legislative intent expressed in N.C.G.S. § 62-158 to allow expansion funds to be used in this case because an alternative that appeared to be feasible is available." In support of this position, the Commission cited the Public Staff's testimony that using expansion fund financing when a feasible alternative was available would not be consistent with legislative intent. If Frontier could serve the Four-County area using traditional financing, the supplier refunds currently being held by Piedmont for inclusion in the expansion fund could be used to extend natural gas service to other unserved areas. The Commission also noted the Public Staff's testimony with regard to the limited availability of expansion funds.

The Commission further explained that the express terms of N.C.G.S. § 62-158 provide for the use of an expansion fund only when construction of natural gas facilities in the territory at issue would otherwise be economically infeasible. Given this legislative mandate, it would be inappropriate to grant a certificate premised on the use of expansion fund financing where another applicant has offered credible evidence that adequate service can be provided without such non-traditional financing.

The Commission next focused on the production of credible evidence that traditional financing was indeed economically feasible. Specifically, the Commission found that detailed market and economic feasibility studies prepared by an independent consultant conclusively demonstrated that it was feasible to provide natural gas service to the Four-County area using traditional, rather than expansion fund, financing. The evidence in support of this finding was contained in the testimony and exhibits of Scott Heath of Heath and Associates, Inc.; Frontier witnesses Robert Oxford and Steven Shute; and the Public Staff panel.

Heath, president of Heath and Associates and a registered professional engineer, testified that Heath and Associates was hired to conduct an independent detailed market survey and economic feasibility study. Heath testified that in order to identify, compare, and prioritize the market potential of the residential and commercial customers, the populated areas within the Four-County area were divided into fifty-three study areas. The project areas represented over 170 square miles and over 600 miles of roads. Heath testified

that the market survey demonstrated that the Four-County area has sufficient industrial, commercial, and residential loads to support an independent gas utility. Industrial loads of approximately three million dekatherms per year were identified as potential sales for Frontier. The approximately 428 miles of distribution main would make gas available to 16,000 residential and 1,500 commercial customers; additional residential and commercial markets exist in more rural areas and may also become economically attractive opportunities for Frontier. There are also approximately 500 poultry farms that represent potential gas loads within the Four-County area, with between 225 and 325 of these being economical to connect.

In addition to the market study, Heath testified that Heath and Associates performed a detailed feasibility study using (1) information provided in the market study, (2) construction and other costs developed after review of Frontier's design of the pipelines necessary to serve the Four-County area, (3) the costs of gas supply and capacity, and (4) the proposed retail rates Frontier would offer to its customers. Based on the results of the economic feasibility study, Heath testified that a natural gas utility could construct and operate an economically feasible, positive net present value (NPV) project within the Four-County area. He also testified that Frontier's proposed retail gas rates must be set higher than other established utilities to generate the revenue needed to make the project feasible. These rates should not, however, inhibit Frontier's ability to connect customers and maintain sales to industrial customers. In sum, Heath found Frontier's project economically feasible.

Frontier also offered the testimony of Robert J. Oxford, chairman of the board and president of Frontier, and Steven Shute, an officer and shareholder of Frontier and a registered professional engineer specializing in rural gas utilities. Both testified that the Heath and Associates report demonstrates that the potential customers and loads identified by Frontier in the Four-County area can be converted to natural gas at the full range of rates and rate designs that Frontier proposed for approval. In addition, they offered evidence that the system design would provide adequate and reliable service.

The Public Staff witnesses testified that based on their review of the market study, construction cost estimates, and financing plans for the Frontier project, they agreed with Heath's conclusion regarding the economic feasibility of the project. They further testified that they had reviewed the system design and verified the flow calcula-

572 IN THE SUPREME COURT

STATE ex rel. UTILITIES COMM. v. PIEDMONT NAT. GAS CO.

[346 N.C. 558 (1997)]

tions provided by Frontier and had concluded that the design proposed by Frontier was adequate.

From this and other testimony, the Commission concluded that the Heath and Associates studies prove that Frontier's proposed 428-mile, predominantly rural distribution system, which covers twice as many miles as Piedmont's proposal, is feasible using traditional financing. It will make natural gas service available to more citizens and businesses with the attendant opportunities for economic development.

Finally, the Commission noted that Frontier was the only applicant willing to provide service to the Four-County area using traditional financing and that it had adequately satisfied the ten conditions set forth in the Commission's 20 July 1995 order. These circumstances, coupled with Piedmont's unwillingness to provide service without the use of expansion fund financing, persuaded the Commission that public convenience and necessity required that Frontier be awarded the final certificate.

We are cognizant of Piedmont's argument that the Commission's focus on the issue of expansion fund versus traditional financing was arbitrary and capricious under N.C.G.S. § 62-94(b)(6). Piedmont asserts that an Idaho case, *In re Applications of Intermountain Gas Co.*, 77 Idaho 188, 289 P.2d 933 (1955), is instructive on the question of whether the Commission's decision to focus on a single factor, in disregard of other competing factors, is arbitrary and capricious. In *Intermountain Gas* the Idaho Public Service Commission issued a certificate to Idaho Natural Gas rather than Intermountain Gas. The Commission's approval of the Idaho Natural proposal rested upon speculation as to future service possibilities. The Idaho Supreme Court reversed the Commission's order, stating that "[a]n order based upon a finding made without evidence, or upon a finding made upon evidence which clearly does not support it, is an arbitrary act against which courts afford relief." *Id.* at 202, 289 P.2d at 942 (citations omitted).

*Intermountain Gas* is clearly distinguishable from the circumstances presented here. Here, the Commission based its decision on tangible evidence and express testimony rather than speculative considerations. Further, the Commission considered a multitude of factors before awarding the certificate to Frontier. The Commission found persuasive, *inter alia*, that Frontier proposed a much more extensive rural distribution system than did Piedmont, thus increasing potential economic development; that Frontier had a much

STATE ex rel. UTILITIES COMM. v. PIEDMONT NAT. GAS CO.

[346 N.C. 558 (1997)]

shorter construction schedule than Piedmont; that new companies such as Frontier should be encouraged to come to North Carolina to provide utility service to citizens of our state who are now without service; and that Frontier agreed to file a final financing plan as a way of satisfying any concerns raised during the proceedings. Further, contrary to Piedmont's assertions, the record indicates that the Commission carefully considered the rights, interests, and preferences of the citizens of the Four-County area. The Commission stated that over 150 people attended the public hearing in Wilkesboro and acknowledged that "a number of the public witnesses testified for Piedmont, citing its lower rates." However, Frontier's proposed rates were considerably less than the cost of alternative energy sources in the Four-County area; and in an effort to protect consumer interest, the Commission strongly discouraged Frontier from raising its rates at any point over the next five years.

No law prohibits the Commission from giving one factor greater weight than any other. The Commission found that both Piedmont and Frontier had made a *prima facie* case that they were qualified and capable of providing natural gas service to the Four-County area. This finding necessarily required the Commission to weigh the relative importance of other, external factors. Based on its interpretation of the legislative intent of the gas expansion statutes, the Commission gave the greatest weight to the sources of funding proposed by the two applicants.

A determination by the Commission is considered *prima facie* just and reasonable. *State ex rel. Utilities Comm'n v. Ray*, 236 N.C. 692, 697, 73 S.E.2d 870, 874 (1953). The burden is on the appellant to demonstrate an error of law in the proceedings. *State ex rel. Utilities Comm'n v. Champion Papers, Inc.*, 259 N.C. 449, 456, 130 S.E.2d 890, 895 (1963). To be arbitrary and capricious, the Commission's order would have to show a lack of fair and careful consideration of the evidence or fail to display a reasoned judgment. *State ex rel. Utilities Comm'n v. Thornburg*, 314 N.C. 509, 515, 334 S.E.2d 772, 776 (1985). Based on a review of the whole record, we conclude that Piedmont has not sustained its burden of demonstrating either that the Commission's order was unsupported by competent, material, and substantial evidence or that the order failed to display a reasoned judgment.

[4] Piedmont next challenges two procedural aspects of the Commission proceedings. Piedmont asserts first that the Commission allowed Frontier to amend its proposal and to offer additional evi-

dence without providing a similar opportunity to Piedmont. Piedmont further contends that the Commission excluded evidence properly offered by Piedmont in rebuttal to the testimony of the Public Staff. Piedmont argues that the Commission's procedures were unlawful, arbitrary, and capricious; in excess of the Commission's statutory authority; and violative of Piedmont's rights to due process.

The Commission established prefiling dates at the outset of the proceedings which allowed for the filing of testimony, exhibits, and rebuttal testimony. The Commission ordered that the direct testimony and exhibits of Frontier and Piedmont had to be filed by 23 November 1994, that the direct testimony and exhibits of the Public Staff had to be filed by 11 January 1995, and that rebuttal testimony of Frontier and Piedmont had to be filed by 23 January 1995. Pursuant to this order, Piedmont filed the direct testimony of three Piedmont executives as well as thirty-eight pages of rebuttal testimony from the same three witnesses, all of which was admitted into evidence. On 8 February 1995 the parties agreed that the Public Staff would file additional testimony to make its recommendation and that the hearing would reconvene on 7 March 1995 for the presentation of that testimony. On the afternoon of 6 March 1995, Piedmont filed and served twenty-six pages of "Supplemental Rebuttal Testimony" and seventy-nine pages of new exhibits. Among other things, Piedmont offered evidence that Frontier's proposal would cost in excess of $77 million, rather than $46.9 million as projected by Frontier, and that Piedmont could, in fact, finance the project without using any expansion funds. At the hearing the following day, Frontier objected to those portions of the evidence that contained new information and that were not offered to rebut the recommendation of the Public Staff. The Commission ruled that evidence presented would be confined to the rebuttal of the Public Staff's testimony. However, the Commission explicitly noted that the ruling did not foreclose the possibility of considering the testimony at a later time. Thereafter, the evidence that was in the nature of rebuttal testimony was admitted, and the new testimony that was in the nature of additional direct testimony was excluded.

Despite the Public Staff's recommendation that Frontier be awarded the certificate, the Commission conditionally offered the certificate to Piedmont. Piedmont declined the certificate on the grounds that it could not adequately service the Four-County area without the use of expansion funds. Based upon evidence presented at the hearings in late 1994 and early 1995, the Commission issued an

STATE ex rel. UTILITIES COMM. v. PIEDMONT NAT. GAS CO.

[346 N.C. 558 (1997)]

order on 20 July 1995 giving Frontier the option of accepting a conditional certificate. The Commission required Frontier to complete and file ten specified items and scheduled a meeting in December 1995 to determine whether Frontier adequately met the required conditions. In response to the order, Frontier filed thirty-three pages of testimony, explaining and authenticating over 920 pages of exhibits in satisfaction of the conditions. The hearings for this phase of the proceedings were held 12-14 December, after which the Commission issued its final order awarding a certificate to Frontier.

The Commission has been given the authority and responsibility for regulating public utilities, and in doing so it is allowed to exercise its discretion and judgment. The procedure before the Commission is relatively informal; and the Commission, in the absence of any statutory inhibition, may regulate its own procedures and adopt reasonable rules and regulations. *State ex rel. Utilities Comm'n v. Carolinas Comm. for Indus. Power Rates & Area Dev. Inc.*, 257 N.C. 560, 569, 126 S.E.2d 325, 332 (1962). In this case the Commission established prefiling dates and scheduling orders necessary for the orderly conduct of its business. Piedmont was given notice at all stages of the proceedings and afforded the same opportunities as Frontier to present direct, supplemental, and rebuttal evidence. For example, at the 7 March 1995 hearing, the Commission specifically stated that the evidence excluded at that hearing could be relevant at a later proceeding; yet Piedmont never tendered the evidence again. Moreover, the evidence offered by Piedmont to show that it could finance the project without using an expansion fund was later contradicted by Piedmont's letter declining the conditional certificate offered by the Commission on the grounds that Piedmont considered the project to be financially infeasible without the use of an expansion fund. Piedmont's argument that Frontier was permitted to amend its proposal, while Piedmont was not, ignores the fact that Frontier was *required* by the Commission to file additional testimony in support of its application. Indeed, Piedmont was given the time and opportunity at the 12 December hearing to offer evidence against this additional information required of Frontier but apparently chose not to exercise that option. In sum, we conclude that the Commission's procedures for receiving evidence from both Frontier and Piedmont and its rulings with regard to the admissibility of that evidence were proper in all respects.

Piedmont next argues that the Commission made numerous findings not supported by competent, material, and substantial evidence.

We have already determined that the Commission's final order was properly supported by the evidence presented at all relevant stages of these proceedings. We nevertheless address each of Piedmont's contentions.

[5] Piedmont first challenges the Commission's finding in its 20 July 1995 order that Frontier was formed to develop a rural natural gas system to provide service to Surry, Watauga, Wilkes, and Yadkin Counties. Piedmont contends that the undisputed evidence shows that Frontier was formed to provide service to Wilkes, Surry, and Yadkin Counties and that Watauga County was added only after Piedmont filed its application. Piedmont submits that the Commission may have been influenced by Frontier's prior filing, and therefore the challenged finding was prejudicial to Piedmont's application.

The evidence indicates that Oxford, president of Frontier, initially identified Wilkes County as one of the larger unserved counties in the eastern United States. He testified that he and his associates set up a meeting with representatives of Wilkes County, which was later expanded to include Surry and Yadkin Counties at the request of the Wilkes County officials. Oxford performed an extensive study of the area in March 1994 and decided to apply for a certificate. In April he contacted Watauga County officials and subsequently performed a preliminary feasibility study in that county. However, Oxford's conversations with Piedmont led him to believe that Piedmont favored Watauga over the other three counties. Because Frontier did not wish to oppose Piedmont, Frontier applied for a certificate to service only Wilkes, Yadkin, and Surry Counties. It was only after Piedmont filed its application to serve all four counties, in contravention of what Oxford and Frontier had been led to believe, that Frontier amended its application to include Watauga County. We conclude from the evidence as to this evolution of events that the Commission had adequate support for the finding in question and that Piedmont was not prejudiced thereby.

[6] Piedmont's second argument is that in its 20 July 1995 order, the Commission found Frontier's proposed project to include 718 miles of distribution mains, while in its 30 January 1996 order, the Commission found Frontier's project to be in excess of 428 miles. Piedmont asserts that it was inappropriate for the Commission to change the number of pipeline miles and that there is no evidence to support the number upon which the Commission ultimately relied.

Review of the record reveals that Frontier's initial proposal contained 718 miles of distribution main, which included 115 miles of distribution main running parallel with transmission main. One of the conditions imposed by the Commission on Frontier was that an independent consultant perform a market study. As a result, Frontier filed an analysis prepared by Heath and Associates as to how Heath expected the distribution system to evolve. On cross-examination Scott Heath made clear that the report prepared by his company was not Frontier's proposal but rather an independent assessment. Heath testified that an extensive rural distribution system with an *initial* distribution system of 428 miles could feasibly be constructed; he did not rule out the possibility of a bigger system, depending upon the exact geographical area serviced. In any event, the 428-mile system evaluated by Heath and Associates included farm taps instead of parallel distribution main, so it eliminated 115 miles of distribution main without eliminating any miles of actual natural gas availability.

Further, on cross-examination Frontier witness Shute explained that Frontier's original market survey was compiled using statistical data. Based on 1990 census data, Frontier estimated the number of households it would reach with a given number of miles of distribution line and then calculated conversions from that data. The Heath study, on the other hand, was done on the basis of actually driving down each road within the fifty-three study areas and counting houses, a method which obviously produces a more precise calculation. Shute also testified that Frontier analyzed several areas outside of Heath's fifty-three study areas, including Miller's Creek and Fair Plains, which constituted approximately 143 miles of additional distribution mains and 5,000 more residential customers. Frontier intends to construct these miles of distribution mains and serve these customers. Based on this evidence, the Commission could conclude that the distribution system included in the Heath report, standing alone, is an extensive rural distribution system exceeding the Piedmont proposal and that Frontier intended to add to the initial construction schedule approximately 145 miles of distribution main. There is substantial evidence to support the Commission's findings with respect to the number of miles of distribution mains Frontier intends to construct.

[7] Piedmont next argues that the Commission's conclusion that Frontier would lay more miles of distribution main than Piedmont lacks evidentiary support. The Commission found that Piedmont proposed to construct 215 miles of distribution main. Piedmont now con-

tends that the 215 miles included only a core system and that it did not include the full expanded system Piedmont intended to build. Our review of the record indicates that testimony from Piedmont's own witness contradicts Piedmont's contention that its proposal before the Commission included more than 215 miles. On cross-examination Piedmont witness Ray Killough was asked whether the core system described in Piedmont's application would be the complete system installed to serve the Four-County area customers. Killough responded, "That's correct at this time." This testimony is sufficient to support the Commission's finding.

Piedmont's fourth and fifth challenges are in regard to the Commission's findings that Piedmont's proposed project would result in fewer communities being served than the project proposed by Frontier and that Frontier planned to provide service to twice as many customers as Piedmont and to provide that service sooner than Piedmont. Piedmont argues that these findings are incorrectly based upon a comparison of Piedmont's "core" system with Frontier's total system and therefore have no supporting evidence. Given our prior conclusion that the Commission correctly determined that Piedmont's proposal included 215 miles of distribution main, compared to Frontier's minimum of 428 miles, it logically follows that Piedmont would serve fewer customers and fewer communities. Accordingly, the evidence supports this finding.

[8] In its sixth argument, Piedmont disputes the Commission's finding that Piedmont's proposal was contingent upon 30% or more of the capital being provided from an expansion fund. Piedmont also argues that, unlike Frontier, it was not permitted to introduce evidence as to alternative methods of financing and was not provided an opportunity to show that it could serve the Four-County area using traditional financing, if permitted to charge the same rates as those proposed by Frontier. We note that in its certificate application, Piedmont stated that construction of the Four-County area project would "not produce a positive return based on Piedmont's existing rates," and Piedmont therefore requested approval to use expansion funds to finance the project. Further, Piedmont declined a conditional certificate on the grounds that it was not economically feasible to construct, operate, and maintain the Four-County area project without the use of expansion funds. Piedmont's argument that it was not provided the same opportunities as Frontier to demonstrate that the Four-County area project could be completed using traditional financing misses the mark in that Frontier proposed *ab initio* to use

only traditional financing, whereas Piedmont originally requested the use of expansion funds and never waivered from that position. Indeed, there is no reference in any of Piedmont's filings or exhibits to any other form of financing, and it is not the responsibility of the Commission to permit applicants to file supplemental applications intended to cover all possible financial contingencies. Thus, the evidence supports this Commission finding.

[9] In its seventh argument, Piedmont contests the Commission's finding that its failure to grant a final certificate to Frontier for the Four-County area would likely result in no natural gas being available in these counties in the foreseeable future. Piedmont submits that this finding is not supported by record evidence, considering Piedmont's repeated declarations of desire and ability to serve the area. As we stated earlier, the Commission concluded that it would be inappropriate and inconsistent with the legislative intent expressed in N.C.G.S. § 62-158 to allow expansion funds to be used in this case because alternative financing is feasible. Given (1) this legislative intent, (2) that it is feasible here to use traditional financing, and (3) that Piedmont refused to provide natural gas service to the Four-County area without the use of expansion funds, it follows that if Frontier is not awarded the final certificate, the Four-County area will remain without natural gas service.

[10] By its eighth argument, Piedmont contends that there is no evidence to support the Commission's finding that the Four-County area would have to compete for limited corporate resources because Piedmont had already agreed to meet the Commission's construction schedule set forth in the 19 June 1995 order. As support for this finding, the Commission cites the Public Staff's discomfort with Piedmont's self-documented current customer growth rate, which has been among the highest nationally. The growth in customers has necessarily resulted in increases in Piedmont's construction expenditures. It is inevitable that if Piedmont obtains the certificate for the Four-County area, the area would be required to compete with Piedmont's currently franchised markets, some of which may be more profitable than the Four-County area. It is therefore possible that Piedmont's more lucrative projects may take precedence over the Four-County area project, thereby reducing the corporate resources allocated to that area. The Commission thus could determine that service to the Four-County area would be inhibited or delayed.

[11] Piedmont's ninth and final argument pertains to whether there is sufficient evidence that Frontier satisfied the ten conditions imposed in the Commission's 20 July 1995 order. Piedmont asserts in particular that Frontier failed to satisfy the conditions because conditions one and seven required Frontier to produce a study from an independent consultant to show that Frontier's original proposal was economically feasible, yet the study actually filed was of a much smaller system. Rather than detailing here the voluminous record evidence relating to the independent study performed by Heath and Associates, we will address this assertion in conjunction with Piedmont's contention that the Commission improperly denied Piedmont's motion to dismiss Frontier's 18 October 1995 filing. It suffices to say here that there is competent, substantial, and material evidence to support each of the Commission's findings.

Accordingly, we turn to Piedmont's challenge of the Commission's denial of Piedmont's motion to dismiss. Piedmont moved to dismiss Frontier's 18 October 1995 filing on the ground that the proposal evaluated in the Heath study was not "in substantial compliance with the proposal that Frontier has presented in its testimony" as required by the Commission's 20 July 1995 order. In the motion Piedmont contended that a comparison of the proposal evaluated in the Heath study with the proposal Frontier presented in its testimony shows that the proposal in the Heath study provides for a 40% smaller distribution system, 49% fewer residential customers, 72% fewer commercial customers, 57% fewer poultry farms, 53% fewer total customers, higher rates, 49% less residential volumes, 72% less commercial volumes, and 66% less poultry volumes. Piedmont now argues that the Commission exceeded its statutory authority by permitting Frontier's independent consultant to evaluate a smaller, more expensive proposal, in effect allowing Frontier to substantially alter its proposal, without affording Piedmont a similar opportunity to change its proposal.

In the conditional order dated 20 July 1995, the Commission described Frontier's project as follows:

Frontier's proposed project includes 144 miles of transmission mains and 718 miles of distribution mains and is estimated to cost approximately $47 million. At the end of its first five years of operation, Frontier expects to serve 10,060 residential customers, 2,090 commercial customers, 500 poultry farms, and 20 industrial customers, with annual volumes totaling 4.5 million

dekatherms (dts). Frontier intends to finance its proposed project with capital raised from investors using an initial capital structure of 25% equity and 75% debt, the equity portion of which will increase to a more conservative level within five to eight years of initial operation.

. . . .

. . . Frontier's project[] originat[es] with a connection to Transco at U.S. Highway 601, near Cooleemee, extending along road rights-of-way to serve the towns of Yadkinville, Dobson, Elkin, Mount Airy, Wilkesboro, North Wilkesboro, and Boone and a number of smaller communities and rural areas in between. . . . Frontier plans to serve . . . such communities as Brooks Cross Roads in Yadkin County; Hays, Fairplains, Mulberry, and Miller's Creek north of North Wilkesboro and Moravian Falls and Boomer south of Wilkesboro in Wilkes County; Deep Gap in western Wilkes County; and White Plains, Toast, and Bannertown in Surry County.

Further, and of particular significance to resolution of this issue, the Commission acknowledged in its order that "[n]either applicant had finalized all of its studies, designs and arrangements" and that "the further proceedings ordered herein involved *finalizing* plans." (Emphasis added.)

On 18 October 1995 Frontier filed the "Market Study and Feasibility Report" prepared by Heath and Associates to satisfy conditions one, three, and seven set forth in the Commission's order of 20 July 1995. Based upon this study, Scott Heath concluded:

Frontier Utilities can construct and operate a natural gas utility in the Four County area as an economically feasible, positive net present value project. Although Frontier Utilities may pursue a more aggressive construction/marketing/connection schedule than is depicted by Heath and Associates in this analysis, Heath and Associates is of the opinion that the economics detailed in this report are economically feasible.

Heath and Associates' conclusions were based on a more conservative system development, which projected by year five 418 miles of distribution main, serving 5,154 residential customers and 215 poultry farms, at a cost of $44 million. While the Heath study differs from Frontier's initial proposal with regard to the pace of the construction and development of the distribution system, it covers basically the

582 IN THE SUPREME COURT

STATE ex rel. UTILITIES COMM. v. PIEDMONT NAT. GAS CO.

[346 N.C. 558 (1997)]

same geographic service area, serves the same markets, uses the same rate structure, involves the same construction and engineering issues, and costs approximately the same.

In addition, Heath made clear that his company's report was not Frontier's proposal but rather was Heath and Associates' analysis and opinion as to how the Four-County area distribution system would likely evolve. He testified that his understanding of Heath and Associates' assignment was to conduct an independent study of the general geographic area Frontier proposes to serve at the same rates Frontier proposes to charge. While acknowledging that the area and mileage included in the Heath study does not include 100% of the initial Frontier proposal, Heath testified that it includes the vast majority of it and that the market study is in substantial compliance with Frontier's proposal.

Finally, regardless of whether the Commission was ultimately persuaded by the Heath development system or the Frontier proposal, both projects were more ambitious than the Piedmont proposal, and both were funded by traditional rather than expansion fund financing. We therefore conclude that Frontier's filing in response to the ten conditions outlined in the 20 July 1995 order was in substantial compliance with Frontier's preliminary proposal, and accordingly the Commission's denial of Piedmont's motion to dismiss was proper.

[12] By its final assignment of error, Piedmont argues that the Commission's interpretation of N.C.G.S. § 62-158 is contrary to legislative intent and therefore in error. The Utilities Commission has previously determined, and this Court has agreed, that the purpose of N.C.G.S. § 62-158 is

to facilitate the construction of facilities and the extension of natural gas service into areas of the State where it may not be economically feasible to expand with traditional funding methods in order to provide infrastructure to aid industrial recruitment and economic development.

State ex rel. Utilities Comm'n v. Carolina Util. Cust. Ass'n, 336 N.C. 657, 667, 446 S.E.2d 332, 338 (1994). This Court has likewise acknowledged that "the Legislature intended for the Commission to fix rates as low as may be reasonably consistent with the requirements of the Due Process Clause of the Fourteenth Amendment." State ex rel. Utilities Comm'n v. Duke Power Co., 285 N.C. 377, 388, 206 S.E.2d

269, 276 (1974). Piedmont argues that N.C.G.S. § 62-158 is to be interpreted *in pari materia* with the General Assembly's intent to set rates as low as possible. In so doing, it argues, the Commission's interpretation of N.C.G.S. § 62-158 must fail because award of the certificate to Frontier based on its ability to use traditional rather than expansion fund financing increases the rates citizens of the Four-County area would have paid under Piedmont's proposal by $1.2 million per year. Piedmont argues that in view of the purpose of N.C.G.S. § 62-158 to attract industry and increase economic development, as well as the Commission's duty to fix rates as low as reasonably possible, the Commission's requirement that Piedmont forego its rights to apply for and use expansion funds to fund a portion of the cost of providing service to the Four-County area was contrary to the intent of N.C.G.S. § 62-158. We disagree.

Section 62-158(a) provides:

> In order to facilitate the construction of facilities in and the extension of natural gas service to unserved areas, the Commission may, after a hearing, order a natural gas local distribution company to create a special natural gas expansion fund to be used by that company to construct natural gas facilities in areas within the company's franchised territory that otherwise would not be feasible for the company to construct. The fund shall be supervised and administered by the Commission. Any applicable taxes shall be paid out of the fund.

N.C.G.S. § 62-158 (Supp. 1996). First, examination of the statutory language reveals that expansion funds may be used to provide natural gas service to unserved areas "within the company's franchised territory." Piedmont's argument overlooks the fact that the Four-County area is not within its franchised territory. Therefore, any proclaimed right Piedmont has to the creation and use of an expansion fund is limited to those areas in which it already possesses a certificate of public convenience and necessity. That "right" does not extend to unfranchised areas, such as the Four-County area, which are the subject of competing certificate applications.

Further, assuming *arguendo* that Piedmont's request to use expansion funds to serve the Four-County area was proper, the Commission's order was nevertheless in accordance with statutory intent. Section 62-158 limits the creation of expansion funds for the development of natural gas facilities to unserved areas in which service otherwise would not be feasible. To implement this statute, the

584 IN THE SUPREME COURT

STATE ex rel. UTILITIES COMM. v. PIEDMONT NAT. GAS CO.

[346 N.C. 558 (1997)]

Commission adopted Rule R6-82, which requires that an LDC show "that there are unserved areas in the LDC's franchised territory and that expansion of natural gas facilities to such areas is economically infeasible." N.C. Utilities Commission, *North Carolina Public Utilities Laws and Regulations*, Rule R6-82(b) (1993 ed.) (Michie 1994). Rule R6-82(d) states that "[b]efore ordering the establishment of a fund, the Commission must find that it is in the public interest to do so." If the Commission determines, in its discretion, that the creation of an expansion fund would not be in the public interest, it would presumably decline to order the creation of a fund.

Here, the Commission determined that the public interest would best be served by construction of natural gas facilities using traditional methods of financing rather than an expansion fund. That conclusion was supported in part by the testimony of former state Representative Joe Mavretic, who initiated the review of natural gas expansion as a member of the Joint Legislative Utility Review Committee and was involved in the drafting and enactment of N.C.G.S. § 62-158. Mavretic testified:

> [T]he expansion fund was never intended to be used in a situation where a firm proposed to expand natural gas and make it available using its own resources. . . . [I]t flies in the face of common sense in two areas. First of all, if the expansion fund were to be used in a situation of expansion where a non-fund firm would go[,] then instead of having these four counties getting natural gas and other counties being available for the expansion fund you only have the four counties, and it seems to me that if we want to increase natural gas availability in as many counties as possible, 100 if we can, then we would certainly use a firm who wants to pay for it all to expand into four counties and use that expansion money in areas where we don't have other firms that want to come in.
>
> . . . .
>
> . . . [I]f we use the expansion fund to close out the initiative of a firm from outside North Carolina it would have a chilling effect on other firms outside of North Carolina who might want to come into this State into our underserved or unserved areas for natural gas.

In this case Frontier's using its investors' capital to serve the Four-County area, while Piedmont's expansion fund is preserved for future use in other unserved areas, is economically sound. The Commission

could conclude that it would be a waste of resources to use expansion funds when they are not needed, thereby depriving other areas of the use of these funds.

In addition the Commission's final order in this proceeding discusses at length the legislative history of N.C.G.S. § 62-158 and other, related natural gas expansion statutes. We have already reviewed this portion of the order in detail and find the Commission's interpretation of the statute correct.

[13] Finally, it is the policy of this state and the duty of the Commission "[t]o provide just and reasonable rates and charges for public utility services." N.C.G.S. § 62-2(4) (1989). While the Commission seeks to establish the lowest possible rates, that is not the polar star by which the Commission conducts its business. Rather, the Commission is guided by considerations of the public interest. Under the circumstances presented here, the Commission could determine that the method of financing expansion of natural gas service into the Four-County area takes precedence over the limited differential between the rates proposed by Piedmont versus those proposed by Frontier and that it is in the public interest and in accordance with the policy goals of this state to pursue gas expansion through traditional financing if such an alternative is reasonably available.

[14] Under this final assignment of error, Piedmont also argues that the Commission erred because it did not employ the net present value (NPV) method of analysis to determine if the Four-County area project was feasible, as required by N.C.G.S. § 62-158. Section 62-158(c) provides that "[o]nly those projects with a negative net present value shall be determined to be economically infeasible for the company to construct." Net present value is defined as "[t]he present value of expected future net cash inflows over the useful life of a Project minus the present value of net cash outflows." Commission Rule R6-81(b)(3). Piedmont asserts that, here, the Commission made no effort to determine the economic feasibility of the Piedmont project but simply determined that because Frontier believed it could finance the project without using expansion funds, that project was economically feasible and therefore automatically preferred.

Initially, we note that the Commission must apply the NPV method only in evaluating the feasibility of a single proposal, not when there are competing applicants, one of which conclusively

demonstrates the economic feasibility of a project financed in an alternative manner. Moreover, the record indicates that Piedmont repeatedly asserted that the extension of natural gas service into the Four-County area had a negative NPV and could only be accomplished with the aid of expansion funds, whereas Frontier demonstrated with empirical data and studies that a positive NPV project was indeed possible. Accordingly, the Commission's valuation of the economic feasibility of the two projects was proper and supported by the evidence.

After a careful review of the record, we hold that the Commission's interpretation of N.C.G.S. § 62-158 was consistent with the language and intent of chapter 62 and of the policy of this state; that the Commission's final order contains findings sufficient to justify its conclusion that Frontier should be awarded the final certificate of public convenience and necessity to provide natural gas service to Surry, Wilkes, Watauga, and Yadkin Counties; and that the Commission did not err in its conduct of the proceedings. The orders of the Utilities Commission are therefore

AFFIRMED.