STATE OF NORTH CAROLINA EX REL. UTILITIES COMMISSION; BELLSOUTH TELECOMMUNICATIONS, INC., COMPLAINANT-APPELLEES v. THRIFTY CALL, INC., RESPONDENT-APPELLANT

No. COA01-1466

(Filed 19 November 2002)

**1. Utilities— number of panel members—resignation of panel member**

The North Carolina Utilities Commission's order did not contravene N.C.G.S. § 62-76 even though the recommended order was decided by a panel of two commissioners after one of the panel members resigned, because: (1) one commissioner's resignation from the panel did not recharacterize the two remaining members as hearing commissioners or deprive the panel of jurisdiction to enter an order; (2) the statute does not prohibit members of a Commission panel from participating in a decision appealed to the full Commission; and (3) the statute only limits a commissioner's involvement when he has issued a recommended order in the capacity of a hearing commissioner, and the two remaining commissioners were acting as panel members and not as individual hearing commissioners.

**2. Telecommunications—audit—intrastate tariff**

The North Carolina Utilities Commission did not err by failing to require plaintiff telecommunications company to conduct an

STATE ex rel. UTILS. COMM'N v. THRIFTY CALL, INC.

[154 N.C. App. 58 (2002)]

audit that was allegedly required by the company's intrastate tariff, because: (1) there is no language in the tariff provision that requires the company to audit defendant long distance interexchange carrier before filing a complaint to enforce its tariff; (2) reading the word "may" to mean "shall" would require an audit to be conducted any time there was a billing dispute rather than resolution through different means; (3) nothing in the record demonstrated it was the intent of the parties to require plaintiff to conduct an audit before seeking to enforce its rights under the tariff; and (4) the tariff only allows for one audit to be conducted by plaintiff each year and limits the scope of the audit to the previous quarter.

**3. Telecommunications— long distance interexchange carrier—percent interstate usage—intrastate usage**

The North Carolina Utilities Commission did not abuse its discretion by concluding that defendant long distance interexchange carrier misreported its Percent Interstate Usage (PIU) and by characterizing the pertinent calls as intrastate in nature, because: (1) FCC opinions have discussed the fact that court and Commission decisions have considered the end-to-end nature of the communications more significant than the facilities used to complete such communications; (2) other states have held that long distance calls which originate and terminate within the state are intrastate calls even though they may be routed through a switch located in another state; and (3) evidence in the record demonstrated that over ninety percent of the calls originated and terminated in North Carolina.

**4. Telecommunications—back-billed charges—laches**

The North Carolina Utilities Commission did not err by concluding that defendant long distance interexchange carrier company is obligated to pay plaintiff telecommunications company for back-billed charges even though defendant contends the claim should have been barred under the doctrine of laches, because: (1) the record fails to demonstrate that defendant pled the defense of laches in its answer to plaintiff's complaint; (2) defendant has failed to demonstrate a change in conditions that makes the prosecution of plaintiff's claim unjust; and (3) the language of plaintiff's tariff does not prohibit the Commission from ordering back-billing since to do so would deny plaintiff nearly complete relief from the misreporting of access traffic.

60          IN THE COURT OF APPEALS

STATE ex rel. UTILS. COMM'N v. THRIFTY CALL, INC.

[154 N.C. App. 58 (2002)]

### 5. Utilities— telecommunications—monetary damages

The North Carolina Utilities Commission did not err by allegedly exceeding its statutory and jurisdictional authority in ordering money damages, because: (1) the Commission's order is simply the remedy afforded plaintiff telecommunications company to collect the unpaid access fees required under its North Carolina tariff; and (2) denying the Commission the authority to order back-billing in this case would prevent it from enforcing the tariff and protecting customers.

Appeal by respondent from order dated 14 June 2001 by the North Carolina Utilities Commission. Heard in the Court of Appeals 18 September 2002.

*Kilpatrick Stockton LLP, by M. Gray Styers, Jr., for complainant-appellee.*

*Brooks, Pierce, McLendon, Humphrey & Leonard, L.L.P., by Marcus W. Trathen and David Kushner, for respondent-appellant.*

McGEE, Judge.

BellSouth Telecommunications, Inc. (BellSouth) filed a complaint against Thrifty Call, Inc. (Thrifty Call) on 11 May 2000 alleging that Thrifty Call intentionally and unlawfully reported erroneous Percent Interstate Usage (PIU) factors to BellSouth in violation of BellSouth's North Carolina Access Services Tariff (intrastate tariff).

The evidence presented before the North Carolina Utilities Commission (the Commission) tended to show that Thrifty Call is a long-distance, interexchange carrier that has operated in North Carolina and has been a BellSouth customer since 1996. Thrifty Call purchased access to BellSouth's local exchange network under BellSouth's Tariff FCC No. 1 (FCC tariff) and BellSouth's intrastate tariff in order to carry long distance calls to and from customers of North Carolina BellSouth. BellSouth charged Thrifty Call either interstate or intrastate access charges, depending upon the originating and terminating points of the call. The billing rates for these charges were calculated using the PIU reporting method with the data provided by Thrifty Call. Interstate access rates, which are lower than intrastate rates, are established by the FCC tariff, while intrastate access rates are established by the Commission.

Thrifty Call routed all of the long distance calls in its network destined for North Carolina through its physical facilities in Atlanta, Georgia, including long distance calls that originated and terminated in North Carolina. Thrifty Call calculated its PIU based on the Federal Communications Commission's (FCC) entry/exit surrogate (EES) methodology and reported that ninety-eight percent of its calls in North Carolina were interstate. These calls were billed under the FCC interstate tariff rate.

The Commission referred the matter to a three-member panel to hear the case as provided under N.C. Gen. Stat. 62-76(a). The case was heard on 5 December 2000 by Commissioners Sam J. Ervin, IV, William R. Pittman, and J. Richard Conder. Commissioner Pittman resigned from the panel on 24 January 2001 and did not participate in the recommended order. The remaining panel issued a recommended order ruling on complaint (recommended order) dated 11 April 2001 ordering Thrifty Call to pay BellSouth $1,898,685 for Thrifty Call's underreported intrastate calls. Thrifty Call filed exceptions to the recommended order on 3 May 2001 and requested oral argument, which was scheduled for 21 May 2001. The Commission issued a final order dated 14 June 2001 denying Thrifty Call's exceptions and affirming the recommended order. Thrifty Call moved for reconsideration of the final order and moved to hold the proceeding in abeyance on 10 August 2001. The Commission denied both of these motions on 27 August 2001. Thrifty Call appeals.

[1] Thrifty Call first argues the Commission's order contravenes N.C.G.S. § 62-76 because the recommended order was decided by a panel of two commissioners after one of the panel members resigned. N.C. Gen. Stat. § 62-76(a) (2001) states that a case may be heard by "a panel of three commissioners, hearing commissioner or examiner to whom a hearing has been referred by order of the chairman." Pursuant to N.C.G.S. § 62-76(a), the matter was referred to a three-member panel which had "all the rights, duties, powers and jurisdiction conferred by [the statute] upon the Commission." The panel issued a recommended order to which Thrifty Call filed exceptions and requested oral argument before the full Commission.

Thrifty Call contends that Commissioner Ervin should not have participated in the oral argument and the Commission's decision because he acted as a hearing commissioner in the initial decision. N.C.G.S. § 62-76(c) states:

STATE EX REL. UTILS. COMM'N v. THRIFTY CALL, INC.

[154 N.C. App. 58 (2002)]

In all cases in which a pending proceeding shall be assigned to a hearing commissioner, such commissioner shall hear and determine the proceedings and submit his recommended order, but, in the event of a petition to the full Commission to review such recommended order, the hearing commissioner shall take no part in such review, either in hearing oral argument or in consideration of the Commission's decision, but his vote shall be counted in such decision to affirm his original order.

In interpreting statutory language, we must give effect to the intent of the General Assembly. *Clark v. Sanger Clinic, P.A.*, 142 N.C. App. 350, 354, 542 S.E.2d 668, 671, *disc. review denied*, 353 N.C. 450, 548 S.E.2d 524 (2001). We primarily rely on the language of the statute itself and refrain from judicial construction in the absence of ambiguity in the express terms of the statute. *Id.* at 354, 542 S.E.2d at 671-72.

In the case before us, Commissioner Ervin was a member of a panel of three commissioners to which the case was assigned; he was not serving as an individual hearing commissioner. Furthermore, Commissioner Pittman's resignation from the panel did not recharacterize the two remaining members as hearing commissioners or deprive the panel of jurisdiction to enter an order. The two remaining commissioners had the authority to issue recommended or final orders in accordance with the statute. The statute does not prohibit members of a Commission panel from participating in a decision appealed to the full Commission. The statute only limits a commissioner's involvement when he has issued a recommended order in the capacity of a hearing commissioner. Commissioners Conder and Ervin were acting as panel members and not individual hearing commissioners in this case. This assignment of error is without merit.

[2] Thrifty Call next argues the Commission erred by failing to require BellSouth to conduct an audit that was required by BellSouth's intrastate tariff. Thrifty Call argues that the word "may" in BellSouth's intrastate tariff requires, rather than permits, BellSouth to conduct an audit of Thrifty Call's records before filing a complaint. The relevant section of BellSouth's North Carolina tariff states:

When an IC provides a projected interstate usage percent as set for in A. preceding, or when a billing dispute arises or a regulator commission questions the projected interstate percentage for BellSouth SWA, the Company may, by written request, require the

IC to provide the data the IC used to determine the projected interstate percentage. This written request will be considered the initiation of the audit.

BellSouth Access Services Tariff § E2.3.14(B)(1) (April 26, 2000).

This Court finds no authority governing the interpretation or construction of tariffs and must choose a method for analyzing and interpreting the tariff. We believe utility tariffs are sufficiently similar to contracts to avail themselves to the rules of contractual interpretation.

> If the language of a contract "is clear and only one reasonable interpretation exists, the courts must enforce the contract as written" and cannot, under the guise of interpretation, "rewrite the contract or impose [terms] on the parties not bargained for and found" within the contract. *Woods v. Nationwide Mut. Ins. Co.*, 295 N.C. 500, 506, 246 S.E.2d 773, 777 (1978). If the contract is ambiguous, however, interpretation is a question of fact, *Barrett Kays & Assoc., P.A. v. Colonial Bldg. Co., Inc. of Raleigh*, 129 N.C. App. 525, 528, 500 S.E.2d 108, 111 (1998), and resort to extrinsic evidence is necessary, *Holshouser v. Shaner Hotel Grp. Props. One*, 134 N.C. App. 391, 397, 518 S.E.2d 17, 23, *disc. review denied*, 351 N.C. 104, 540 S.E.2d 362 (1999), *aff'd per curiam*, 351 N.C. 330, 524 S.E.2d 568 (2000). "An ambiguity exists in a contract if the 'language of a contract is fairly and reasonably susceptible to either of the constructions asserted by the parties.' " *Barrett*, 129 N.C. App. at 528, 500 S.E.2d at 111 (citations omitted). Thus, if there is any uncertainty as to what the agreement is between the parties, a contract is ambiguous. *Id.* This Court's "review of a trial court's determination of whether a contract is ambiguous is *de novo.*" *Id.*

*Crider v. Jones Island Club, Inc.*, 147 N.C. App. 262, 266-67, 554 S.E.2d 863, 866-67 (2001).

Absent evidence of a contrary intent by the tariff drafters in the record or tariff, this Court will apply the plain meaning of the word. *Black's Law Dictionary* defines the word "may" as (1) "Is permitted to," (2) "Has a possibility," and (3) "Loosely, is required to; shall; must." Black's Law Dictionary 993 (7th ed. 1999). The definition states that the first entry is the primary legal use of the word while the third entry is used "usually in an effort to effectuate legislative intent." *Id.* Similarly, *The American Heritage Dictionary* defines

"may" as "[t]o be allowed or permitted to" and "[t]o be obliged; must. Used in deeds and other legal documents." The American Heritage Dictionary 839 (3rd ed. 1991).

While this Court agrees that the word "may" can be used to mean "shall" or "must," we do not agree that the word is so used in the case before us. We choose to apply the plain meaning of the word "may" in light of the absence of evidence that a contrary definition was intended. There is no language in this tariff provision that requires BellSouth to audit Thrifty Call before filing a complaint to enforce its tariff. Furthermore, reading the word "may" to mean "shall" would require an audit to be conducted any time there was a billing dispute rather than resolution through different means. Nothing in the record demonstrates it was the intent of the parties to require BellSouth to conduct an audit before seeking to enforce its rights under the tariff. Additionally, the tariff only allows for one audit to be conducted by BellSouth each year and limits the scope of the audit to the previous quarter. Reading the word "may" to mean "shall" would allow BellSouth to enforce its rights only once a year, after conducting its one, limited audit. We find no evidence that the drafters of the tariff intended such a limitation on BellSouth's ability to enforce its rights. A plain reading of this section of the tariff compels a conclusion that the right to seek an audit is permissive and not required. This assignment of error is without merit.

[3] Thrifty Call next contends the Commission erred in concluding that Thrifty Call misreported its PIU. Thrifty Call argues the Commission ignored the plain meaning of BellSouth's FCC tariff language concerning interstate usage, which resulted in an erroneous and arbitrary and capricious order.

> A reviewing court may reverse or modify the Commission decision if substantial rights of an appellant have been prejudiced because the Commission's findings, inferences, conclusions or decisions are: (1) violative of constitutional provisions; (2) beyond the statutory authority or jurisdiction of the Commission; (3) based upon unlawful proceedings; (4) affected by other errors of law; (5) unsupported by competent, material and substantial evidence in view of the entire record as submitted; or (6) arbitrary or capricious.

*State ex rel. Utilities Comm'n v. N.C. Gas Service*, 128 N.C. App. 288, 291, 494 S.E.2d 621, 624 (1998); *see* N.C. Gen. Stat. § 62-94 (2001). The standard of review requires this Court, after reviewing the entire

record, to determine if "the Commission's findings and conclusions are supported by substantial, competent, and material evidence." *N.C. Gas Service*, 128 N.C. App. at 291, 494 S.E.2d at 624. Substantial evidence is defined as any relevant evidence that would permit a reasonable mind to support a conclusion. *Utilities Comm. v. Coach Co.*, 19 N.C. App. 597, 601, 199 S.E.2d 731, 733 (1973), *cert. denied*, 284 N.C. 623, 201 S.E.2d 693 (1974). The presumption is that the Commission gave proper consideration to all competent evidence and reached a just and reasonable conclusion. *State ex rel Utilities Comm. v. Piedmont Nat. Gas Co.*, 346 N.C. 558, 569, 573, 488 S.E.2d 591, 598, 601 (1997).

Thrifty Call argues that the FCC tariff requires that the classification of the call be determined by where the call enters the subcontractor's network under the EES methodology rather than the point from which the call originated. *See In re Amendments of Part 69 of the Commission's Rules Relating to the Creation of Access Charge Subelements for Open Network Architecture*, Report and Order & Order on Further Reconsideration & Supplemental Notice of Proposed Rule Making, 6 F.C.C.R. 4524, 4535-36, ¶ 66 (1991). Thrifty Call argues that if its switch is located in a different state than where the call exits the network, it is classified as interstate. Under this methodology, virtually all of Thrifty Call's business would be classified as interstate. *Id.* It would also permit carriers to convert their intrastate minutes into interstate minutes whenever profitable simply by changing the routing of the call once it has been placed.

Thrifty Call cites several sources of authority in support of its argument. First, Thrifty Call cites to FCC decisions describing the EES methodology. The FCC has stated that

> interstate usage generally ought to be estimated as though every call that enters an OCC network at a point within the same state as that in which the station designated by dialing is situated were an intrastate communication and every call for which the point of entry is in a state other than that where the called station is situated were an interstate communication.

*In re MCI Telecommunications Corp. Determination of Interstate and Intrastate Usage of Feature Group A and Feature Group B Access Service*, Memorandum Opinion and Order, FCC 85-145, 57 Rad. Reg. 2d (P&F) 1573, 1582, ¶ 25 (1985), *recon. denied*, 59 Rad. Reg. 2d (P&F) 631 (1985); *In re Determination of Interstate and Intrastate Usage of Feature Group A and Feature Group B Access Service,*

Supplemental Notice of Proposed Rule Making, 1 F.C.C.R. 1042, 1045, ¶ 5 n.6 (1986).

Thrifty Call also cites *Western Union Tel. Co. v. Speight*, 254 U.S. 17, 18, 65 L. Ed. 104, 105 (1920), *reversing*, 178 N.C. 146, 100 S.E. 351 (1919), and argues it is controlling in the case before us. In *Speight*, the United States Supreme Court held that a telegraph that originated in Greenville, North Carolina and terminated in Rosemary, North Carolina, was considered interstate because it was routed through Richmond, Norfolk, and Roanoke Rapids, Virginia. *Id.* The Court stated that "[t]he transmission of a message through two States is interstate commerce as a matter of fact. The fact must be tested by the actual transaction." *Id.* (citations omitted).

While *Speight* appears similar to the facts at hand, the facts are distinguishable and this Court does not find it controlling. *Speight* was decided in 1919 and has been cited only once in subsequent cases. *See Ward v. Western Union Telegraph Co.*, 22 S.W.2d 81 (Mo. Ct. App. 1929). In *Speight*, the message was telegraphed to Richmond, Virginia and then subsequently telegraphed to Weldon, North Carolina as it made its way to Rosemary. *Id.* at 19, 65 L. Ed. at 105. The telegraph did not simply travel along telegraph lines across the Virginia line and back after its initial transmission; the telegraph had to be independently transmitted by operators from each relay point. *Id.* The actual telegram was a series of communications.

In the case before this Court, there was only one telephone call made during the transmission of the call. The call switched networks and was routed through Atlanta before the transmission terminated in North Carolina, but the transmission consisted of only one call. The transmission was not divided into a series of individual transmissions as the telegraph in *Speight* was. Since the transmission originated and terminated in North Carolina and consisted of only one actual call, this case is distinguishable from *Speight*.

Additionally, federal courts and the FCC have declined to characterize calls of this nature as a series of multiple calls. The FCC "has focused on the 'end points of the communication and consistently has rejected attempts to divide communications at any intermediate points of switching or exchanges between carriers.' " *Bell Atlantic Telephone Companies v. FCC*, 206 F.3d 1, 4 (D.C. Cir. 2000) (quoting *In re Implementation of the Local Competition Provisions in the Telecommunications Act of 1996*, Intracarrier Compensation for ISP-Bound Traffic, 14 F.C.C.R. 3689, 3695, ¶ 10 (1999)).

STATE ex rel. UTILS. COMM'N v. THRIFTY CALL, INC.

[154 N.C. App. 58 (2002)]

The dividing line between the regulatory jurisdictions of the FCC and states depends on "the nature of the communications which pass through the facilities [and not on] the physical location of the lines." Every court that has considered the matter has emphasized that the nature of the communications is determinative rather than the physical location of the facilities used.

*National Association of Regulatory Utility Commissioners*, 746 F.2d 1492 (D.C. Cir. 1984) (quoting *California v. FCC*, 567 F.2d 84, 86 (D.C. Cir. 1977) (per curiam), *cert. denied*, 434 U.S. 1010 (1978); citing *United States v. Southwestern Cable Co.*, 392 U.S. 157, 20 L. Ed. 2d 1001 (1968)).

FCC opinions have also discussed the fact that "court and Commission decisions have considered the end-to-end nature of the communications more significant than the facilities used to complete such communications." *Teleconnect Company v. The Bell Telephone Company of Pennsylvania*, File Nos. E-88-83 et seq, Memorandum Opinion and Order, 10 F.C.C.R. 1626, 1629, ¶ 12 (1995). The FCC has found that "a debit card call that originates and ends in the same state is an intrastate call, even if it is processed through an 800 switch located in another state." *In the Matter of The Time Machine, Inc., Request for a Declaratory Ruling Concerning Preemption of State Regulation of Interstate 800-Access Debit Card Telecommunications Services*, Memorandum Opinion and Order, 11 F.C.C.R. 1186, 1190, ¶ 30 (1995).

Similarly, other states have examined the characterization of long distance calls that originate and terminate in the same state after being routed through other states. The Idaho Public Utilities Commission found these calls to be intrastate, stating that

the simple rule adopted by the Federal Communications Commission and by this Commission is that when a call has an end user origination and termination in the same state it is jurisdictionally an intrastate call for regulatory purposes. The intermediate transport or switching does not alter the jurisdictional nature of the call even if it occurs outside the state's boundaries.

*Northwest Telco, Inc. v. Mountain States Telephone and Telegraph Co.*, 88 Pub. Util. Rep. 4th 462, 464 (Idaho Pub. Util. Comm'n 1987). The Florida Public Utilities Commission has stated that "long distance telephone calls which originate and terminate within the State

of Florida are intrastate calls subject to [the Florida Public Utilities Commission's] jurisdiction even though they may be routed through a switch located in another state." *In re: Show Cause Action Against Southland Systems, Inc.*, Order No. 11342, 82 FPSC 179 (1982); *see also In re Cease and Desist Order to Hart Industries of Intrastate Wide Area Toll Service*, Order No. 10256, 81 FPSC 73 (1981).

Thrifty Call has cited no controlling authority that compels us to reverse the decision of the Commission. Evidence in the record demonstrates that over ninety percent of the calls originate and terminate in North Carolina. It also shows that Thrifty Call is acting as a subcontractor for another long distance carrier for the minutes in question. Furthermore, Thrifty Call admitted that it uses the originating and terminating points of telephone calls in Georgia to determine whether the call was interstate or intrastate. Testimony presented before the Commission provided a sufficient basis for determining that a called station refers to the end-user being called, not a switch within the network. The Commission concluded that telephone traffic originating in North Carolina, routed through a switch in Atlanta, Georgia, and delivered to an end-user in North Carolina was intrastate in nature.

The Commission reviewed the FCC and intrastate tariffs and determined they were substantially similar. It found that both tariffs classified calls based on the point where they originated and were placed in the customer network by callers. Testimony indicated that Thrifty Call ordered feature group access that did not utilize the EES methodology. After an examination of the record, this Court concludes there is substantial evidence to support the conclusions of the Commission. We hold that the Commission correctly characterized these calls as intrastate in nature and did not abuse its discretion or err as a matter of law. This assignment of error is without merit.

[4] Thrifty Call argues the Commission erred by concluding that Thrifty Call is obligated to pay BellSouth for back-billed charges. Thrifty Call first contends there is no competent evidence that BellSouth is owed the amount alleged in the complaint. As previously stated, the standard of review requires this Court, after reviewing the entire record, to determine if "the Commission's findings and conclusions are supported by substantial, competent, and material evidence." *N.C. Gas Service*, 128 N.C. App. at 291, 494 S.E.2d at 624. Substantial evidence is defined as any relevant evidence that would permit a reasonable mind to support a conclusion. *Coach Co.*, 19 N.C. App. at 601, 199 S.E.2d at 733. The complainant bears the burden of

proving the facts that entitle it to relief. *Utilities Commission v. Teer Co.*, 266 N.C. 366, 372-73 146 S.E.2d 511, 516 (1966).

Mike Harper (Harper) of BellSouth testified before the Commission detailing the calculations used in determining the alleged damages. Harper testified that these records demonstrated that ninety-nine percent of Thrifty Call's traffic terminating in North Carolina was intrastate. Harper also testified that Thrifty Call's records showed the difference between the application of the interstate rate and the intrastate rate totaled $1,898,685 between January 1998 and April 2000. The Commission subsequently found this determination to be "well-supported" by the testimony before entering the order.

> [T]he Commission may agree with a single witness—if the evidence supports his position-no matter how many opposing witnesses might come forward. This Court is then required to determine whether the Commission's decision is supported by "competent, material and substantial evidence in view of the entire record as submitted."

*State ex rel. Utilities Comm. v. Eddleman*, 320 N.C. 344, 352, 358 S.E.2d 339, 346 (1987) (quoting N.C. Gen. Stat. § 62-94(b)(5) (1982)). This Court finds substantial evidence in the record supporting the amount of damages alleged by BellSouth.

Thrifty Call contends BellSouth's claim for back-billing should have been barred under the doctrine of laches.

> Laches is an affirmative defense that must be pled, and the burden of proof is upon the party who pleads it. The defense of laches will bar a claim when the plaintiff's delay in seeking a known remedy or right has resulted in a change of condition which would make it unjust to allow the plaintiff to prosecute the claim.

*Cieszko v. Clark*, 92 N.C. App. 290, 297, 374 S.E.2d 456, 460 (1988) (citations omitted). The record fails to demonstrate that Thrifty Call pled the defense of laches in its answer to BellSouth's complaint. Additionally, Thrifty Call has failed to demonstrate a change in conditions that makes the prosecution of BellSouth's claim unjust.

Thrifty Call also argues the Commission erred because the back-billed time period exceeds that permitted under BellSouth's tariff. Thrifty Call contends that the tariff allows BellSouth to conduct an

audit once a year and limits any back-billing to one quarter preceding the audit. We have already stated that BellSouth is not required to seek an audit before seeking to enforce its rights before the Commission. The back-billing provision applies solely to when an audit has been undertaken by BellSouth, which is not the case before us. Additionally, we do not believe the language of the tariff prohibits the Commission from ordering back-billing because to do so would deny BellSouth nearly complete relief from the misreporting of access traffic.

[5] Finally, Thrifty Call argues the Commission exceeded its statutory and jurisdictional authority in ordering money damages. The Commission may "exercise such general power and authority to supervise and control the public utilities of the State as may be necessary to carry out the laws providing for their regulation, and all such other powers and duties as may be necessary or incident to the proper discharge of its duties." N.C. Gen. Stat. § 62-30 (2001). Additionally, "the Commission shall be deemed to exercise functions judicial in nature and shall have all the powers and jurisdiction of a court of general jurisdiction as to all subjects over which the Commission has or may hereafter be given jurisdiction by law." N.C. Gen. Stat. § 62-60 (2001).

In *State ex rel. Utilities Comm. v. Southern Bell*, 88 N.C. App. 153, 363 S.E.2d 73 (1987), this Court held that a Commission-ordered compensation plan did not constitute money damages or a penalty in contravention of N.C.G.S. § 62-94(b)(2). In *Southern Bell*, we stated that a "plan requiring compensation to the LECs for lost revenues . . . is reasonably calculated to provide protection for the local exchanges who provide needed services to local exchange customers . . . . The plan is therefore statutorily authorized." *Southern Bell*, 88 N.C. App. at 169-70, 363 S.E.2d at 83.

In the case before us, the Commission's order requiring Thrifty Call to pay the amount owed does not constitute the award of money damages in excess of its statutory authority. The Commission's order is simply the remedy afforded BellSouth to collect the unpaid access fees required under its North Carolina tariff. Denying the Commission the authority to order back-billing in this case would prevent it from enforcing the BellSouth tariff and protecting customers. This assignment of error is without merit.

We affirm the order of the North Carolina Utilities Commission.

LEEKS v. CUMBERLAND CTY. MENTAL HEALTH DEV'L DISAB. & SUB. ABUSE FACIL.

[154 N.C. App. 71 (2002)]

Affirmed.

Judges WALKER and HUNTER concur.